**Ruth KAHN, Plaintiff Below, Appellant,**

v.

**HOUSEHOLD ACQUISITION CORPO-RATION and Household Finance Corporation, Defendants Below, Appellees.**

Supreme Court of Delaware.

Submitted: Oct. 16, 1990.
Decided: April 11, 1991.

Pamela S. Tikellis and Carolyn D. Mack, Greenfield & Chimicles, Wilmington (Sidney B. Silverman (argued), Silverman & Harnes, New York City, of counsel), for appellant.

A. Gilchrist Sparks, III (argued), and Lawrence A. Hamermesh, Morris, Nichols, Arsht & Tunnell, Wilmington, for appellees.

Before CHRISTIE, C.J., HORSEY and WALSH, JJ.

WALSH, Justice.

This is an appeal from a decision of the Court of Chancery, after trial, in a class action by minority shareholders of Wien Air Alaska, Inc. ("Wien") arising out of the merger of Wien with its principal shareholder, Household Acquisition Corporation ("HAC"), a wholly-owned subsidiary of Household Finance Corporation ("HFC") (collectively "Household"). Plaintiff-below, Ruth Kahn ("Kahn"), on behalf of the class, alleged that HAC breached its fiduciary duty to the minority class by manipulation of the timing and terms of the merger and through non-disclosure of essential financial data. The Court of Chancery rejected the fiduciary claims but ruled that minority shareholders who did not vote for the merger or tender their shares were entitled to a "quasi-appraisal" remedy and fixed the fair value of Wien stock at $7.27 per share.

Kahn appeals from certain of the Court of Chancery's rulings relating to non-disclosure of proxy information and rejection of plaintiff's expert's conclusion on valuation. Kahn also contends that the Court of Chancery erred in excluding certain members of the class from sharing in the increased valuation by reason of tendering their shares or voting for the merger. Household cross-appeals from the Court of Chancery's determination of value in excess of the $6 merger price, and the court's allowance of a quasi-appraisal remedy in the absence of a finding of unfair dealing. We affirm the rulings of the Court of Chancery with respect to the fiduciary claims and valuation, but reverse as to the exclusion of certain members of the plaintiff class.

I

Wien, an Alaska corporation, was at the time of the proposed merger the largest air carrier in Alaska. Prior to deregulation of the airline industry, it was the primary air

carrier of passengers, freight and mail serving Alaska's principal population centers. The airline had operated profitably prior to 1977 when a crippling pilots' strike lasting twenty-two months severely impacted earnings. By the time the strike had ended in 1979, Wien stock was trading in a range from $3.50 to $6.00 per share with 3.7 million shares outstanding.

In June, 1979, Household approached Wien's management with a proposal to purchase all outstanding Wien shares at $6.00 per share if the Wien board of directors approved the transaction. Although a majority of Wien's board voiced approval, certain directors with substantial holdings voted against the proposal. Later, however, Household was able to acquire management-held shares, approximately 18 percent of the outstanding shares, at the offered price.

Household commenced its tender offer on July 31, 1979 with an offering price of $6.00 per share. In the meantime, however, Alaska Airlines, Inc., ("Alaska Airlines") Wien's major competitor, had begun purchasing Wien stock in the open market after earlier being rebuffed in its efforts to purchase all of Wien's stock at $6.50 per share. The principal basis for rejection of the Alaska Airlines overture by the Wien board appears to have been antitrust considerations. Alaska Airlines' purchases served to drive the market price above $6.00 per share with the result that on August 15, 1979, Household increased its offer price to $6.50 per share. By the fall of 1979, Household had acquired 56 percent of Wien's outstanding stock, including the purchase of 1,000,000 shares from Wien at $6.50 per share at management's request in order to cure certain debt problems. During 1980, Household proceeded to acquire other large blocks of Wien stock through direct purchase. In May, it purchased the holdings of Alaska Airlines for $6.00 per share after Alaska Airlines was stymied in its efforts to secure regulatory approval for holding an equity portion in Wien. In August, Household acquired a block of stock held by a Wien pilots group, also for $6.00 per share. Thus, at the time of the proposed merger, Household's ownership of Wien's outstanding shares amounted to 88.4 percent.

On October 6, 1980, Household presented a formal merger proposal at a special meeting of Wien's directors. The proposal came as no surprise since in its July 31, 1979 tender offer Household had indicated an intention to seek a merger if it acquired a controlling, but less than a total, number of shares. Household proposed to cash out minority shareholders at $6.00 per share, a figure it arrived at after analyzing the most recent bid price for Wien stock ($4.75) and the maximum paid through its tender offer ($6.50). The five independent directors on the Wien board unanimously endorsed the Household proposal with the proviso that the company secure a fairness opinion from its investment banker, Solomon Brothers. At its next meeting, on November 21, the Wien directors received a formal opinion from Solomon Brothers to the effect that the proposed $6.00 per share cash price was "fair from a financial point of view to the public holders of the Company's common stock."

On October 22, 1980, shortly after the public announcement of the tentative approval of the merger by Wien's directors, plaintiff commenced her class action in the Court of Chancery to enjoin consummation of the merger. The court rejected plaintiff's injunctive effort noting that since there was no claim that the merger lacked a proper business purpose but merely that the price and timing were unfair, an adequate remedy existed in class recovery of such "additional amount to each minority shareholder as may be necessary to constitute a fair price." *Kahn v. Household Acquisition Corporation, et al.*, Del.Ch., C.A. No. 6293, Brown, V.C. slip op. at 9, 1980 WL 3185 (Dec. 12, 1980). In view of Household's dominant ownership, the consummation of the merger was a mere formality, accomplished following a special meeting of stockholders on December 16, 1980.

Although at trial plaintiff mounted a broad ranging attack on the timing and manner of the merger, in this appeal she has narrowed the dispute to three rulings

of the Court of Chancery: (1) that Household was not obligated to supplement its proxy statement concerning Wien's mail subsidy; (2) that the minority shares be fixed at a third party sale value; and (3) that the class entitled to share in the increased valuation should be limited to those minority shareholders who neither voted for the merger nor tendered their shares. Household has cross appealed both from the granting of a quasi-appraisal remedy and from the resulting value fixed by the Vice Chancellor.

## II

Plaintiff's proxy claim relates to the annual payment made to Wien by the federal government for mail and freight service to remote areas of Alaska. The payment for this "subsidy" is set periodically by the Civil Aeronautics Board ("CAB") after negotiations with the carrier. In the five years previous to the merger, the CAB subsidy had represented from three to four percent of operating revenues. Negotiations between Wien and the CAB concerning the 1980 subsidy had been in progress for several months. On December 2, 1980, Wien and the CAB subsidy staff reached preliminary agreement on a subsidy rate of $6.2 million which represented a compromise between the $7–10.7 million sought by Wien and the $4.9 million tendered by the CAB staff. The actual subsidy amount was not formally fixed until approval by CAB order on January 28, 1981.

The November 24, 1980 proxy statement disclosed the prospect of future subsidy payments in the following excerpt.

Wien management has projected net income of $1.43 million for 1980. There is no assurance that this projection will be realized. It is currently anticipated that actual net income for 1980 will be materially less than the amount projected, unless Wien's subsidy or mail rate from the U.S. Government, both of which are presently under review by the CAB, is increased during 1980 substantially over the amounts proposed by the CAB. See 'Business and Properties of Wien— Business of Wien'. If a substantial sub-

sidy or mail rate increase were granted in 1980, actual net income could reach, or even exceed, the amount projected, although there can be no assurance that this will occur. See 'Projections for 1980'.

The "Projections for 1980" recited revenues of $118,346 million, net income of $1.431 million and net income per share of $.30 but qualified these projections with the following:

Most of the factors upon which the foregoing projections are based are beyond the control of Wien and are subject to significant uncertainties and contingencies. Such projections were merely estimates of expected results of operations for 1980, and there is no assurance that they will be realized. It is currently anticipated that actual net income for 1980 will be materially less than the amount projected, unless Wien's subsidy or mail rate from the U.S. Government, both of which are presently under review by the CAB, is increased during 1980 substantially over the amounts proposed by the CAB. See 'Business and Properties of Wien—Business of Wien'. If a substantial subsidy or mail rate increase were granted in 1980, actual net income could reach, or even exceed, the amount projected, although there can be no assurance that this will occur. Neither Wien, HFC nor HAC expects to furnish updated projections to Wien shareholders.

In the Court of Chancery and on appeal, plaintiff argues vigorously that Household had a duty to supplement its proxy statement to disclose the results of the December 2, 1980 staff agreement. The failure to provide this updated information, it is argued, significantly affected the total mix of financial information which a reasonable shareholder could be expected to receive in order to judge the adequacy of the merger price. Moreover, it is contended that the updated subsidy figures were not made available to Solomon Brothers for use in its fairness opinion, which had assumed year end financial data reflecting an operating

loss, thus casting doubt on the reliability of that presentation to Wien directors.

In rejecting the non-disclosure claim, the Court of Chancery deemed the omission of the December 2, 1980 agreement "immaterial" and concluded that such information would not have significantly altered the total mix of data made available to shareholders. The court noted the specific caution in the proxy statement concerning the uncertainty of the 1980 subsidy payments in view of ongoing negotiations. The proxy statement, however, provided sufficient historical information upon which to gauge the effect of those negotiations. Thus, the proxy statement recited the fact that: (1) in the previous five years, the federal subsidy had amounted to 3–4 percent of total operating revenues; (2) in April, the 1979 rate had temporarily increased to $4.2 million; and (3) while the CAB had recommended an increase for 1980 to $4.9 million, Wien management argued for an increase in the $7–10.7 million range. The court also minimized the effect of supplemental information on the fairness opinion in the light of the testimony of the principal author of this opinion that because of the uncertainty surrounding subsidies, they were not a reliable forecasting factor and would not have changed the advice given the Wien board.

■■■ It is not disputed that Household, as Wien's majority shareholder, owed a duty to the minority shareholders to disclose information, within its knowledge, which might assist the minority in taking a position on the proposed merger. That duty is one of complete candor and flows from the controlling shareholder's overriding obligation of fair dealing. *Lynch v. Vickers Energy Corp.*, Del.Supr., 383 A.2d 278, 279 (1977). The duty of disclosure extends to information which is material to the deliberations of the shareholder to whom the information is directed. Under federal securities law, where the claim is one of omission, there must be a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information

made available." *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). That standard finds equal application in gauging an assertion of unfair dealing against a majority shareholder relating to a proxy statement. *Rosenblatt v. Getty Oil Co.,* Del.Supr., 493 A.2d 929, 944 (1985). The question is a mixed one of law and fact, requiring an "assessment of the inferences" a "reasonable shareholder" would draw and the significance of those inferences to the individual shareholder. *TSC Industries,* 426 U.S. at 450, 96 S.Ct. at 2133.

■■■ Plaintiff contends that Wien's subsidy was of great importance to its 1980 earnings and the failure of Household to supplement its proxy statement to advise shareholders of an "agreement in principle" which substantially increased the 1980 subsidy constituted a breach of the duty of full disclosure. We agree with the Court of Chancery, however, that such supplemental disclosure would have added little to the information already available in the proxy statement. Plaintiff's claim of nondisclosure relates to the supplementing of an outstanding proxy statement based on subsequent events. While the duty of complete disclosure should apply with equal force to supplemental as well as original proxy materials, *see Greenfield v. Heublein, Inc.,* 3d Cir., 742 F.2d 751, 758 (1984), subsequent events may have significance, and thus require disclosure, only as they relate to information originally disclosed. If subsequent events impart a new and significant slant on information already discussed, their disclosure is mandated. If the subsequent event is tentative, ill defined or adds little to material already disclosed, the duty of fresh disclosure is limited. Here, the results of the staff negotiations, while supportive of the carrier's position, did not introduce a significant new fact into the mix of financial data already available to shareholders. Moreover, that which plaintiff characterizes as an "agreement in principle" had been reached at the staff level and was subject to approval, and possible modification, at the CAB level. The CAB approval did not occur until almost two months after staff agreement.

We also agree with the Vice Chancellor's finding that Household was under no duty to provide the results of the staff negotiations to Roger Miller ("Miller"), the principal author of the fairness opinion rendered by Solomon Brothers to the Wien board on November 21, 1980. Since Miller testified that the agreement would not have altered his previous view of the merger, it is difficult to understand how minority shareholders would have benefitted from any additional disclosure to Solomon Brothers.

### III

At trial, both parties presented evidence concerning the fairness of the merger price. Household sought to justify its $6 per share offer through the testimony of Miller of Solomon Brothers who had originally supported the merger price through the fairness opinion. Miller pursued a market-based analysis while plaintiff's expert, James E. Walter ("Walter"), opined in favor of a $10 per share price based primarily on Wien's liquidation value. The Vice Chancellor rejected both positions, fashioning instead a $7.27 price which, in effect, represented an adjusted net asset value. In this appeal, both parties dispute the validity of the court's valuation finding.

### A.

Before addressing the merits of the parties' respective valuation contentions, we are required to consider a challenge by Household to the authority of the Court of Chancery to conduct its quasi-appraisal determination in this case under the standard announced in *Weinberger v. UOP, Inc.*, Del.Supr., 457 A.2d 701 (1983). In the Court of Chancery, Household's challenge to the court's valuation approach occurred post-trial through reargument of the question of whether, under an entire fairness claim, the court may proceed to a fair price determination after having rejected an assertion of unfair dealing. In view of the trial court's finding absolving Household of unfair dealing, it was argued that Wien's minority shareholders were relegated to a standard appraisal proceeding under the law of Alaska, the state of Wien's incorporation. In rejecting that contention, the Court of Chancery ruled that plaintiff's action could be accommodated as one of the types of cases specifically entitled to share in the quasi-appraisal remedy granted in *Weinberger*.[1]

On appeal, Household acknowledges that it did not initially contest the applicability of Delaware law as formulated in *Weinberger*, but in view of the trial court's rejection of plaintiff's unfair dealing claim, the legal predicate for a quasi-appraisal methodology no longer existed. Since Alaska law provides for a right of appraisal, it is argued, the plaintiff class is limited to that remedy provided by Wien's state of incorporation, particularly since the plaintiff's claim originated as one for breach of fiduciary duty on the part of a majority shareholder.

Household's argument concerning the remedy for plaintiff's claim of unfair price is directed to a choice of law determination. Although the pretrial order entered into by the parties reflects Household's contention that "the statutory right of appraisal afforded in the merger under Alaska law was the exclusive remedy available to plaintiff and the members of the class," the pretrial order makes no referral to Alaska statutory or case law and indeed recites the reliance by both parties upon extensive De-

---

1. In *Weinberger,* this Court, in recognition of the precedential effect of its holding and the desirability of limiting its retroactivity, fashioned the following "window."

Obviously, there are other litigants, like the plaintiff, who abjured an appraisal and whose rights to challenge the element of fair value must be preserved. Accordingly, the quasi-appraisal remedy we grant the plaintiff here will apply only to: (1) this case; (2) any case now pending on appeal to this Court; (3) any case now pending in the Court of Chancery which has not yet been appealed but which may be eligible for direct appeal to this Court; (4) any case challenging a cash-out merger, the effective date of which is on or before February 1, 1983; and (5) any proposed merger to be presented at a shareholders' meeting, the notification of which is mailed to the stockholders on or before February 23, 1983.

*Weinberger v. UOP, Inc.,* 457 A.2d at 714–15.

laware decisional law including this Court's opinion in *Weinberger*.[2]

Apart from the representations of the parties as reflected in the pretrial order, it is clear that both parties viewed plaintiff's claim as one for breach of fiduciary duty by a majority shareholder based on the timing and structuring of the merger as well as the inadequacy of the merger price. Both parties conceded equitable jurisdiction and neither suggested or relied upon any provisions of Alaska statutory or decisional law which would vary the equitable standards to be applied by the Court of Chancery. In short, while Household may have reserved its Alaska appraisal defense, it never sought to prove that it had any special effect at trial but was content to justify its valuation position through the fairness opinion of Miller.

Although Household argues that the choice of laws question is governed by this Court's decision in *McDermott, Inc. v. Lewis*, Del.Supr., 531 A.2d 206 (1987) with the result that plaintiff's appraisal remedy is governed by Alaska law as an "internal affair," we are not so persuaded. Were plaintiff's claim to be raised anew, a choice of laws objection might well result in a relegation to the remedy provided by Alaska law. However, this case has a distinctive history. This action was filed on October 22, 1980 and the class certified in 1982. As certified, the class action attacked the merger as unfair in both structure and resulting price. Plaintiff thus fell within that group of litigants who had "abjured an appraisal and whose rights to challenge the element of fair value must be preserved." *Weinberger*, 457 A.2d at 714. Since this case was pending in the Court of Chancery at the time *Weinberger* was de-

cided in 1983, we agree with the Court of Chancery that it clearly falls within the "grandfathered" cases entitled to the benefit of the quasi-appraisal remedy.

## B.

At trial, plaintiff's valuation presentation was based on the opinion of its expert witness, Walter, who maintained that at the time of the merger Wien stock had a value of "not less than $10 per share." His "floor value" approach was constructed on the book value of Wien's assets "adjusted for appraisal values which had a range of from $13.39 to $9.17 per share."[3] The $10 value was selected, as Walter testified, because "it turns out that $10 is somewhat below the median value of the range of values" ascertained for adjusted book value. Walter then compared the range of asset values with the range of values yielded by the ratios of price to operating revenues, price to book value, price to earnings and price to cash flows. He found the resulting measures "moderately consistent" and concluded that he "was within the ballpark of an assessed floor value."

The Vice Chancellor found Walter's analysis "unacceptable as presented" primarily because it was premised on a liquidation value, even though Walter claimed to be calculating a going concern value, *i.e.*, what would be realized through a third party purchase. The court noted that a sale of Wien's assets must take into account the costs of liquidation since, as Walter conceded, a prospective purchaser would view the floor value as the minimum he could secure if the airline could not be profitably operated. To obtain that floor value through liquidation, employee sever-

**2.** Wien was never made a party defendant to the Chancery action although Household, in its answer to the class action complaint, alleged as an affirmative defense plaintiff's failure to join and serve Wien or HAC Alaska Corp. as indispensable parties. The parties have not addressed, and it remains unclear, how an appraisal remedy under Alaska statutory law could be enforced against a non-appearing Alaska corporation. To the extent the Court of Chancery was faced with a choice of law determination, Wien's absence is a further factor in support of the applicability of Delaware substantive law of valuation.

**3.** Walter's adjustment to the book value of Wien's flight equipment resulted in that equipment being accorded a value in the $70–80 million range. This figure was derived, primarily, from a November 19, 1980 letter from Wien's president to Household's general counsel. The letter reflected various estimates from other airlines and trade publication listings of prices to be realized if Wien's fleet were sold as a package.

ance benefits estimated at $5 million and tax costs of $19.7 million must be deducted from any sale price. These adjustments to Walter's net asset value resulted in a valuation of $34,480,000. The court declined to discount this figure further, as Household argued, to allow for the estimated one year time period required to effect the liquidation, reasoning that there would be a corresponding appreciation offset. The court then fixed an asset value per share of $7.27 by dividing the asset valuation ($34,480,000) by the number of shares outstanding (4,742,577).

In recognition of the requirement that liquidation value may not be used as the sole measure of value under the standard announced in *Weinberger v. UOP, Inc.*, the Vice Chancellor proceeded to consider other valuation techniques, which Walter employed for comparison purposes, including consideration of operating revenues, book value, earnings, cash flow and the market value of Wien stock immediately preceding the merger announcement. The Vice Chancellor noted that all these indicia of value suffered from some infirmity in view of the erratic pattern of past operating revenues and earnings attributable to Wien's prolonged pilot strike. Similarly, the court rejected reliance on the market value of Wien stock immediately preceding the merger because of the small percentage of such shares in public hands and the knowledge of Household's plan to acquire those shares through the tender offer. Although recognizing that no value technique offered, in itself, a reliable indicia of value, the court settled upon the adjusted asset standard as the most accurate reflection of value. That figure, $7.27 per share, was viewed as being at the midpoint between the average of the applied price ratios ($11.47) and the listed market value of Wien stock immediately prior to the merger ($4.75).

Miller's valuation approach was market based, *i.e.*, he focused on the worth of Wien's stock as reflected in the market beginning in May, 1979, a month before the first public announcement of Household's interest. In effect, he reconstructed Wien's market price to arrive at a figure which reflected, in his words, "what Wien stock would have traded at as of December 16, 1980, had Household not intervened with its acquisition effort." He considered the price changes in comparable companies and concluded that Wien's performance was below average and that the price of its stock would not reflect the increase seen in other airlines. Miller considered, but rejected, other valuation techniques because of lack of comparability with other airlines due to the labor strike, heavy reliance on mail revenues and regulatory restrictions.

The Court of Chancery rejected Miller's market based analysis primarily because it was too narrowly focused. The court noted that in beginning the analysis in 1979 when Wien was just emerging from the pilots' strike, Miller ignored Wien's pre-strike performance which was well above average when compared with other airlines. The court also faulted Miller's treatment of the regulatory climate as a totally negative factor rather than giving consideration to its upside, *i.e.*, the restriction on competition in the Alaskan market.

Both parties express disagreement with the trial court's valuation finding. Plaintiff contends the court should not have treated Walter's $10 per share floor value as a liquidation value since it was based on a third party sale assumption. Household, for its part, assails the $7.27 price fixed by the court as simply a disguised, but adjusted, liquidation value—a technique the court implicitly rejected when tendered by Walter.

As previously noted, since plaintiff's fair price claim fell within the quasi-appraisal remedy fashioned in *Weinberger v. UOP* the resulting valuation determination undertaken by the Court of Chancery could accommodate "any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court...." *Id.* at 713. Only speculative elements attributable to "the accomplishment and expectations" of the merger were to be excluded. 8 *Del.C.* § 262(h). Not only is the scope of admissible evidence enlarged in an

appraisal, or quasi-appraisal undertaking, but the role of the Chancery judge as an informed trier of fact imparts a high level of deference to the review of valuation findings. *Alabama By–Products Corp. v. Neal, et al.*, Del.Supr., 588 A.2d 255 (1991); *Cavalier Oil Corp. v. Harnett*, Del.Supr., 564 A.2d 1137, 1146 (1989); *Bell v. Kirby Lumber Corp.*, Del.Supr., 413 A.2d 137, 150–51 (1980) (Quillen, J., concurring). Measured against this standard of review, we find the Vice Chancellor's valuation clearly sustainable.

■ As is often the case in disputed appraisal proceedings, the dispute over the value of Wien shares at the time of the merger became a battle of experts, each espousing a particular technique which purported to demonstrate the fairness of their respective positions. For his part, Miller, who had previously gone on record with the Wien board in endorsing the fairness of Household's $6 merger price, sought to justify that position through a market-based analysis. Walter, on the other hand, approached valuation by focusing on Wien's assets and the floor value to be realized through their sale. As the Vice Chancellor noted, the principal valuation technique of each expert was subject to criticism and each acknowledged the limitations of the other valuation techniques which they used to "test" their primary approach.

It is true, as Household argues, that the Vice Chancellor's acceptance of Walter's asset value approach resulted in that technique dominating the court's ultimate valuation finding. This result, however, was dictated by Wien's strike history and the lack of comparable companies which rendered price/earnings and discounted cash flow analysis not particularly meaningful. In fixing upon asset value as the basic component of fair value, the court, in effect, recognized that Wien, typical of its industry, was asset intensive. In adjusting Wien's assets to reflect the realities of either liquidation or third party sale, the court was employing recognized adjustment measures, some of which were advocated at trial by Household. In testing its asset-derived valuation against earnings and market results, the court was giving consideration to "all relevant factors" as section 262 requires. Finally, the court was careful to exclude from its value consideration plaintiff's evidence of "post-merger offers" received by Household for Wien. Such discussions and overtures were not admissible as valid indications of merger-date fair value because they were not "known or susceptible of proof as of the date of the merger." *Weinberger*, 457 A.2d at 713, but instead arose "from the accomplishment or expectation of the merger." 8 *Del.C.* § 262(h).

The Court of Chancery, when faced with disparate valuation evidence from experts for both parties, was entitled to draw its own conclusions from the evidence. Under our test of appellate review, we cannot conclude that the decision of the Court of Chancery was not the product of a logical and orderly deductive process.

■ Household maintains that permitting the plaintiff class to pursue a fair value determination after its failure to prevail on its fair dealing allegations is inconsistent with this Court's holdings in *Rabkin v. Philip A. Hunt Chemical Corp.*, Del.Supr., 498 A.2d 1099 (1985) and *Cede & Co. v. Technicolor, Inc.*, 542 A.2d 1182 (1988). Apart from the fact that this case falls squarely within the *Weinberger* window, an obvious distinction is that both decisions involved rulings at the pleading stage concerning the limitations of a statutory appraisal remedy *vis-a-vis*, claims of fraud (*Cede & Co.*) and bad faith (*Rabkin*) where the underlying fair dealing claims have been found deficient as a matter of law. Given the context of those rulings, they do not control the question of what remedy may be available after trial where the jurisdiction of the Court of Chancery to provide equitable relief was not seriously challenged prior to trial.

## IV

■ We turn now to plaintiff's remaining claim of error: that the Vice Chancellor erred in limiting the class members entitled to share in the increased valuation. This claim presents a question of law subject to

plenary review. *Fiduciary Trust Co. v. Fiduciary Trust Co.*, Del.Supr., 445 A.2d 927, 930 (1982).

In a post-trial ruling, the Vice Chancellor decided that only those class members who neither voted for the merger nor surrendered their shares should receive the benefit of the quasi-appraisal remedy. This ruling, however, was subject to one proviso, based on the history of this litigation in the Court of Chancery: any shareholder who had tendered shares after January 19, 1982, the date of an earlier Court of Chancery ruling that recognized standing by plaintiff to pursue an entire fairness claim despite surrender of her shares, would be deemed to have done so in reliance on that ruling and thus not be foreclosed from participation in the class recovery.

In limiting class recovery to those shareholders who had not voted for the merger or surrendered their shares, the Court of Chancery construed this Court's holding in *Bershad v. Curtiss–Wright Corp.*, Del. Supr., 535 A.2d 840 (1987) as mandating that result. In our view, however, the standing question is only partly controlled by *Bershad*. While the Court of Chancery correctly ruled that shareholders who voted for the merger cannot now share in the *increased* valuation, two earlier rulings of that court, which constitute the "law of the case" in this matter, require a contrary result with respect to the surrendering of shares.

In *Bershad*, also a quasi-appraisal case preserved under *Weinberger's* window, this Court affirmed a Court of Chancery ruling that certain members of the plaintiff class who had voted in favor of the merger or who had tendered their shares "cannot thereafter attack its fairness." *Id.* at 848. Plaintiff contends that *Bershad* is distinguishable because the merger of Dorr–Oliver into its parent, Curtiss–Wright, the owner of sixty-five percent of its shares, was conditioned on the approval of a majority of Dorr–Oliver's minority shareholders. Since the merger was ultimately approved by 79.7 percent of the minority shares, the voting by the minority shareholders took on independent significance. In the House-

hold–Wien merger, it is argued, there was no majority of the minority vote requirement. The result was thus foreordained and participation in that voting should be accorded no significance.

The denial of standing to certain members of the class in this case results from the application of either estoppel or acquiescence, long recognized as defenses to equitable action. When the Court of Chancery invokes the principles underlying these defenses, it works a forfeiture of equitable rights and denies the interposition of a Court of Equity because the petitioning party's conduct is viewed as incompatible with the seeking of equitable relief. A judicial declaration of forfeiture must be undertaken with care based on an assessment of the particular conduct in each case.

Estoppel and acquiescence are related doctrines of equity. "[E]stoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded ... from asserting rights which might perhaps have otherwise existed, ... as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position for the worse...." 3 J. Pomeroy, *Equity Jurisprudence* § 804, at 189 (1941). Similarly, "[a]cquiescence in the wrongful conduct of another by which one's rights are invaded may often operate, upon the principles of and in analogy to estoppel, to preclude the injured party from obtaining many distinctively equitable remedies to which he would otherwise be entitled." *Pomeroy* § 817, at 245.

It is under the doctrine of estoppel that a shareholder who votes for a merger may be precluded from asserting his right to equitable relief if the corporation relies, in good faith, on the vote of that shareholder in consummating the transaction. Reliance is not limited to situations where the corporation cannot proceed in the absence of an affirmative expression by the shareholder. It may exist where the corporation establishes a non-determinative voting procedure to secure an expression of minority shareholder support. The essential rationale for denying standing to a

shareholder who votes in favor of the merger is that the shareholder cannot assume a pose of approval in the voting process and then seek to litigate under a contrary position in a Court of Equity. Thus, we agree with the Court of Chancery that *Bershad* finds application to bar standing to any shareholder who voted in favor of the Wien–Household merger.

Acquiescence on the part of the shareholder by, for example, tendering shares and accepting the benefits of the transaction, even though the corporation's conduct is a breach of some duty owed to the shareholder, may also serve to bar the shareholder's right to equitable relief. *Trounstine v. Remington Rand Inc.*, 22 Del.Ch. 122, 194 A. 95, 99 (1937).

The act of surrendering shares is not, however, inequitable conduct which precludes assertion of rights to attack the underlying merger transaction under the facts of this case. Here, the rights of the plaintiff-class must be measured by their status at the time of the merger announcement. In particular, the November 24, 1980 proxy statement advised minority shareholders that class litigation on behalf of the minority shareholders had been commenced in the Court of Chancery asserting lack of a proper business purpose and attacking the fairness of the merger price. The effort to preliminarily enjoin the merger did not succeed, because the Court of Chancery viewed plaintiff's grievance as a claim of inadequate price which, under pre-*Weinberger* jurisprudence, could be remedied notwithstanding the consummation of the merger. However, the court recognized the ability of the minority shareholders "to receive $6.00 per share to have and invest as they see fit while the case is proceeding." *Kahn v. Household Acquisition Corporation, et al.*, Del.Ch., C.A. No. 6293, Brown, V.C. slip op. at 9 (Dec. 12, 1980). The court also noted that if the merger were enjoined "all minority shareholders will be deprived of the opportunity to presently receive something of value for their shares." *Id.* slip op. at 10.

It thus seems clear that, at the inception of this litigation, the Court of Chancery, in permitting the merger vote to proceed, viewed the minority shareholders' plight as substantially ameliorated by their ability to accept the tendered price without prejudice to their right to improve their lot through the later unfolding of the class action. In short, the court anticipated the events which came to pass in this case: despite the effectuation of the merger, the tender price has been deemed inadequate.

The Vice Chancellor recognized that shareholders who relinquished their shares following the 1982 decision of then Vice Chancellor Brown may have been misled into believing that, like plaintiff, Kahn, they could surrender their shares and benefit from future recovery. In our view, class entitlement arose as well by reason of the 1980 decision which rejected injunctive relief, in part, on the rationale that acceptance of the merger price would not bar further relief. In applying the equitable defenses of estoppel or acquiescence, the court should consider what a reasonable minority shareholder was entitled to assume at the time the merger was permitted to proceed and not limit that analysis to a later date when the defense of standing was raised. Accordingly, all members of the class who did not vote in favor of the merger but who abjured their appraisal right in favor of an expanded equity action should share in the result of the quasi-appraisal process without limitation based on the surrender of shares that was anticipated as a consequence of denial of the effort to enjoin the merger.

Our decision to permit all members of the class to participate in the increased valuation is to a large extent *sui generis*, *i.e.*, a result required by the particular facts presented. As noted previously, this case has an unusual history because of the jurisprudential changes which have occurred during the ten years it has been pending in the Court of Chancery as well as the two pretrial rulings, which, inferentially at least, addressed standing. In doing equity, the court must be alert to the need to fashion relief appropriate to the circumstances of each case. *Lynch v.*

*Vickers Energy Corp.*, Del.Supr., 429 A.2d 497 (1981).

Given the unusual history and circumstances of this case, we conclude that it was error for the trial court to foreclose equitable relief to any shareholder who surrendered his or her shares for payment of the merger price by exclusion from the class of minority shareholders entitled to share in the quasi-appraisal remedy. All class members who did not vote in favor of the merger should receive the increased valuation of $7.27 per share fixed by the court.

\* \* \* \* \* \*

The judgment of the Court of Chancery is AFFIRMED in part, REVERSED in part, and REMANDED for further proceedings consistent herewith.