**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JULIA B. WILLIAMS,
Plaintiff-Appellant,

and

FRED MOUZON; CHERYL MOUZON,
Plaintiffs,

v.

No. 95-2964

5300 COLUMBIA PIKE CORPORATION;
CARLYLE HOUSE UNIT OWNERS'
ASSOCIATION, INCORPORATED; ROBERT
FALK; TRISHA HAND; CLAY BROWN;
JOHN HEMSWORTH; BETTY DEMEUTER,
Defendants-Appellees.

FRED MOUZON; CHERYL MOUZON,
Plaintiffs-Appellants,

and

JULIA B. WILLIAMS,
Plaintiff,

v.

No. 95-3091

5300 COLUMBIA PIKE CORPORATION;
CARLYLE HOUSE UNIT OWNERS'
ASSOCIATION, INCORPORATED; ROBERT
FALK; TRISHA HAND; CLAY BROWN;
JOHN HEMSWORTH; BETTY DEMEUTER,
Defendants-Appellees.

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
T. S. Ellis, III, District Judge.
(CA-95-225-A)

Argued: September 25, 1996

Decided: December 3, 1996

Before MURNAGHAN and HAMILTON, Circuit Judges, and
MICHAEL, Senior United States District Judge for the Western
District of Virginia, sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Julian Karpoff, KARPOFF, TITLE & MITNICK, Arlington, Virginia, for Appellants. Thomas Collier Mugavero, MONTEDONICO, HAMILTON & ALTMAN, P.C., Washington, D.C., for Appellees. **ON BRIEF:** Julia B. Williams, Washington, D.C., for Appellants. William John Hickey, MONTEDONICO, HAMILTON & ALTMAN, P.C., Washington, D.C., for Appellees.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

This appeal requires us to decide whether the district court erred in granting appellees' motion for summary judgment pursuant to Fed. R.

2

Civ. P. 56 on appellants' claims (1) that appellees violated the Fair Housing Act, 42 U.S.C. § 3601 et seq., and (2) that appellees breached their contractual and fiduciary duties under Delaware state law. For the reasons stated below, we affirm the judgment of the district court.

BACKGROUND

Appellants Julia Williams and Fred and Cheryl Mouzon--all of whom are black, and one of whom is disabled[1]--were residents of the Carlyle House, a 136-unit residential building owned as a cooperative by the 5300 Columbia Pike Corporation ("Co-op"), a Delaware corporation of which appellants were shareholders. Most units of the Carlyle House were occupied by shareholders, although some were in the Co-op's possession as a result of defaults. Because of various financial difficulties, the Co-op's five-member Board of Directors (Robert Falk, Trisha Hand, Clay Brown, John Hemsworth, and Betty Demeuter), who were also residents of the Carlyle House, decided to explore the possibility of converting the form of ownership from a cooperative association into a condominium regime. The Board believed that conversion would benefit the Co-op's shareholders because it would increase the market value commanded by the units, decrease the Co-op's and the shareholder-residents' debt-service payments, and place final responsibility for tendering timely mortgage payments on the shareholder-residents. Accordingly, the corporation's by-laws were amended to authorize the Board to develop a conversion plan. The amended by-law ("By-law 82") vested the Board with discretion to adopt such a plan, so long as a majority of the Board and a majority of the shareholders approved the plan.

Pursuant to the Board's proposed conversion plan the Co-op was to dissolve and a Virginia corporation, the Carlyle House Unit Owners' Association, Inc. ("Condominium Association"), headed by the same Board, was to take over the duties previously handled through the Co-op. The plan required each participating shareholder to purchase his or her unit and to exchange his or her shares in the Co-op in return for a title in a condominium unit. While it was hoped that all shareholders would participate in the conversion, the Board

_____

**1** Mr. Mouzon has Hodgkin's disease and receives disability payments.

expected that some would be unable to participate because they would not qualify for a mortgage necessary to finance their purchase. To minimize the possibility of nonparticipation, the Board made arrangements with Crestar Mortgage Company ("Crestar"), whose criteria for extending credit were less restrictive than those of other institutions; shareholders had the option, however, of securing financing from any other financial institution if they so preferred. By-law 82 provided that if a shareholder did not participate, the corporation would, "upon conversion acquire title to that property and then sell the unit . . . in a commercial [sic] reasonable fashion and then return to the shareholder the net proceeds of sale after deduction for outstanding indebtedness . . . ." Although By-law 82 suggested that nonparticipating shareholders would be able to capture the predicted increase in value that would redound to participating shareholders from the conversion (or the change from cooperative to condominium status), the conversion plan adopted by the Board rejected this generosity as impracticable because of financial constraints faced by the corporation. The corporation had to purchase any defaulted units as well as all units that chose not to participate, and the amount it could borrow was limited to a percentage of the appraised value of the units as condominiums. Moreover, higher compensation for nonparticipating units would likely encourage nonparticipation, thus aggravating the financial hit the corporation would take if it treated cooperative units as condominiums for valuation purposes. Finally, and decisively, if the corporation were forced to purchase too many units, the entire conversion would fail.[2] Thus, it was decided that nonparticipating shareholders would receive a sum equal to the fair market value of their unit as a cooperative, and not the greater worth their unit would, according to estimates, assume as a condominium.

Subsequent to several informational meetings and following the distribution of the conversion plan to all shareholders, a vote on the conversion plan was conducted, with the result that all voting shares were cast in favor of the plan. Ms. Williams was among those who voted in favor of the conversion plan; Mr. and Mrs. Mouzon did not cast their proxies. None of the appellants voiced any concerns regarding the conversion plan, and all three appellants signed an agreement

_____

[2] According to appellees, purchase of one additional unit would have doomed the conversion plan.

indicating their intention to participate in the conversion plan. Ms. Williams, however, was turned down for a mortgage by Crestar, and the company to which Crestar referred her, because of a troubled credit history and current indebtedness. For like reasons, Crestar also rejected the applications of Mr. and Mrs. Mouzon; although the institution to which Crestar directed the Mouzons offered them a mortgage, they declined the offer because they believed the interest rate (14.9%) to be excessive. As a result of their inability to obtain the necessary financing (on satisfactory terms), appellants were unable to participate in the conversion plan. The units of appellants were appraised by independent professionals, and appellants were paid the amount their units were worth under cooperative ownership.[3] Residents of six units, including appellants, did not participate in the conversion and 114 units participated in the conversion plan. The remaining sixteen units had earlier defaulted on their obligations.[4]

Dissatisfied with receiving compensation for a cooperative unit as opposed to a condominium unit, which would have fetched a higher price according to appellees' estimates, appellants filed this suit, naming as defendants the Co-op, the Condominium Association, and the Board members. Appellants alleged violations of the Sherman Act, 15 U.S.C. § 1 et seq., the Fair Housing Act, and breaches of contract and fiduciary duties under Delaware state law. The district court dismissed appellants' Sherman Act claims pursuant to Fed. R. Civ. P. 12(b)(6), Williams et al. v. The 5300 Columbia Pike Corp. et al., 891 F. Supp. 1169 (E.D. Va. 1995), and subsequently granted summary judgment on the remainder of the claims. Williams et al. v. The 5300 Columbia Pike Corp. et al., Civil Action No. 95-225-A (Sept. 15, 1995); Williams et al. v. The 5300 Columbia Pike Corp. et al., 901 F. Supp. 208 (E.D. Va. 1995). Appellants appeal only from the grant of summary judgment.

_____

[3] Although Ms. Williams received cash for her unit (after the amount she owed the Co-op was deducted), the Mouzons did not receive any money because their debt to the Co-op offset the amount to which they were entitled for their unit. Ms. Williams' unit was purchased for $93,000, and she received $7,121.89. The Mouzons' unit sold for $110,000.

[4] Because a unit may contain a family, and not just an individual, the number of individuals participating does not correspond numerically to the number of participating units.

SUMMARY JUDGMENT PRINCIPLES

We review a district court's grant of summary judgment de novo. Becerra v. Dalton, 94 F.3d 145, 148 (4th Cir. 1996). Under Fed. R. Civ. P. 56(c), summary judgment should issue where "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Unless there is sufficient evidence for a reasonable jury to return a verdict in favor of the nonmovant, an issue is not genuine. Anderson v. Liberty Lobby Inc., 477 U.S. 242, 248 (1986). In making this assessment, the court must view all facts and reasonable inferences drawn therefrom in the light most favorable to the nonmoving party. Smith v. Virginia Commonwealth University, 84 F.3d 672, 675 (4th Cir. 1996) (en banc). Nonetheless, "some metaphysical doubt as to the material facts" will not defeat a motion for summary judgment. Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).

CLAIM UNDER THE FAIR HOUSING ACT

The Fair Housing Act prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling or in the provision of services or facilities in connection therewith, because of race, . . ." 42 U.S.C. § 3604(b), or handicap. Id. § 3604(f)(2). Unlawful discrimination under the Fair Housing Act may be cognizable if either a discriminatory purpose or a disparate impact is demonstrated. Betsey v. Turtle Creek Associates, 736 F.2d 983 (4th Cir. 1984) (citing Smith v. Town of Clarkton, 682 F.2d 1055, 1065 (4th Cir. 1982)). Appellants make no suggestion that appellees' conversion plan was infected by bias harbored by appellees against blacks or handicapped persons; instead, they argue that appellees' conversion plan disproportionately injured groups protected by the Fair Housing Act because members of protected classes were overrepresented in the group of nonparticipating shareholders. Otherwise stated, appellants argue that appellees' facially neutral policy adversely affected blacks and the handicapped more so than other groups. See Edwards v. Johnston County Health Dept., 885 F.2d 1215, 1223 (4th Cir. 1989) (defining disparate impact claims under the Fair Housing Act) (citing Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 936 (2d Cir.), aff'd, 488 U.S. 15 (1988)).

6

Appellants presented the following statistics in support of their claim that blacks and disabled persons suffered disproportionately with the conversion plan. Out of 120 residential units, 114 participated and six did not. Of the participants, eight were black, four Hispanic, ten Asian, and ninety-two white. Of the nonparticipants, two were black, one Hispanic, and three white. Two of the six nonparticipants were disabled (one black, one white), and eight of 114 participants were disabled. The district court agreed that with these statistics appellants, "if only barely," had established a prima facie case of disparate impact discrimination. However, the court below found that appellees had shown "a [nonpretextual] business necessity sufficiently compelling to justify the challenged practice," Betsey, 736 F.2d at 988, for which no less discriminatory alternative was available. See Town of Huntington, 844 F.2d at 936.

As a threshold matter, appellants counter that the Fair Housing Act does not apply to this case as a matter of law. We agree. Crudely stated, the conversion plan placed only one obstacle between a resident and the purchase of his or her unit(s): money. All residents of the Carlyle House were invited and encouraged to participate in the conversion plan; if everyone had been able to secure the requisite financing (whether through Crestar, another financial institution, or a windfall inheritance) no one would have been excluded. The only term, condition, or privilege here at issue entails the requirement that appellants be able and willing to pay the price asked for by appellees. Although it is no doubt true that the "neutral criterion" of price may disparately impact blacks and the handicapped, because they may, on average, be poorer than whites or nondisabled persons, this type of injury extends beyond the reach of the Fair Housing Act. This is because the Fair Housing Act is not so expansive that it would require sales or rentals of residences to those who concede that they are unable to pay the price faced by all other buyers or leasers. The Fair Housing Act does not purport to grapple with the truism that, all things being equal, those with money are better off than those without it. To conclude otherwise would be to effect a radical alteration in the status quo, neither permitted by the plain language of the Fair Housing Act nor its legislative history. Therefore, we hold that when the alleged injury to a claimant is solely the product of a facially neutral price (e.g., a price that does not vary depending on one's race, handicap, or other status protected by the Fair Housing Act), no claim

7

based on disparate impact can be brought under the Fair Housing Act. Because appellants have no claim under the Fair Housing Act as a matter of law, the entry of summary judgment on this claim by the district court was proper.**5**

## CLAIMS FOR BREACH OF CONTRACT AND BREACH OF FIDUCIARY DUTY

The parties agree that Delaware law governs appellants' claims for breach of contract and breach of fiduciary duty against appellees. Here, and not with the Fair Housing Act claim, lies the substance of appellants' complaint. Appellants attack (1) the adoption of the conversion plan and (2) the method of compensation chosen by appellees. They maintain that the conversion plan illegitimately disadvantaged certain shareholders, including themselves, and that it was tainted by appellees' self-dealing; by the term self-dealing, appellants refer solely to the fact that the Board members, as shareholders of the Co-op and prospective owners of their units, would benefit personally from the conversion plan. Further, appellants insist that they were entitled to enjoy the increase in value expected to be brought to their units by the conversion plan. The district court held that Ms. Williams was estopped from making such claims because she voted for the plan. Because the Mouzons submitted no proxies, the district court felt compelled to rule on the substantive merits of their contentions.

_____

**5** Given our holding that the Fair Housing Act does not apply to this case, we have no occasion to pass upon the district court's holding that a prima facie case of disparate impact discrimination can be established where only two members from each class protected by the Fair Housing Act were detrimentally affected (two black units and two disabled units). Nor do we express any opinion on the district court's calculations of the standard deviation in this case, one of which included in the relevant "minority" class blacks, disabled persons, and Hispanics, but excluded the Asian minority. Finally, we have no opportunity to determine whether, after a prima facie case of disparate impact has been established, a party's rebuttal burden includes a showing that there is no less discriminatory alternative to the challenged practice, as the district court held. Compare Huntington Branch, NAACP v. Town of Huntington, 844 F.2d 926, 936 (2d Cir.) (articulating this standard), aff'd, 488 U.S. 15 (1988), with Mountain Side Mobile Estates v. HUD , 56 F.3d 1243, 1255 (10th Cir. 1995) (rejecting this standard).

8

It determined the following as a matter of law: that nonparticipants had no right to share the gains from a profitable corporate endeavor, that there was no legal requirement dictating equal treatment for all shareholders (as opposed to shares), and that the Board members engaged in no self-dealing behavior.

First, we address appellees' argument that all of the appellants before us are barred from making a legal attack on the conversion plan, because if successful the argument will bring an end to appellants' state law claims and will thus conclude our inquiry. Delaware courts have recognized that under the twin doctrines of estoppel and acquiescence wrongful and otherwise actionable conduct by a corporate board may not be redressed by fully informed shareholders who agreed to the conduct and were prepared to accept the benefits to be derived from it. See Kahn v. Household Acquisition Corp., 591 A.2d 166, 176-77 (Del. Super. Ct. 1991). The doctrine of estoppel comes into play when a shareholder votes for a given transaction, the corporation relies on the shareholder's expression of approval, and, subsequently, the shareholder seeks to challenge the transaction. Id. In such circumstances, regardless of the propriety of the transaction in question, the shareholder may be estopped from launching a legal attack against it. Similarly, a shareholder who acquiesces in a transaction by taking actions indicative of an intent to reap its fruits may be precluded from asserting the invalidity of the transaction in court, even if no affirmative vote is cast by him or her. Id. The reasoning behind such a rule is sound. A shareholder should voice his or her concerns about corporate matters to the governing body and give it (and the other shareholders) the benefit of his or her views, as well as an opportunity to reconsider. At the very least, absent some legitimate justification, a shareholder should not enlist the judiciary's aid after having facilitated the passage of that which he or she seeks to overturn.

In the case at bar, Ms. Williams voted for the conversion plan and took steps to participate in the plan, signing an agreement to purchase her unit and applying for financing to achieve this end. Once she was denied credit, she accepted benefits from the implementation of the plan: the Co-op canceled the debt she owed it and paid her $7,121.89. The Mouzons did not vote in favor of the plan (or against it), but neither did they oppose it at any time prior to its completion. Like Ms.

9

Williams, the Mouzons endorsed the plan in an agreement to participate, and, when the credit terms they were offered did not satisfy them, the Mouzons exchanged their shares for relief of a substantial debt obligation to the Co-op. Hence, they too received benefits from the conversion plan.

Appellants seem to concede that principles of estoppel and acquiescence ordinarily would not permit them to challenge a transaction they supported fully, only after it was a fait accompli. Nor do they appear, at least directly, to argue that the mere fact that Mr. and Mrs. Mouzon failed to cast a vote automatically rescues them from the bar against suit. Instead, appellants contend that this bar should not apply here, because they claim the vote (and, by implication, subsequent decisionmaking) were hampered by incomplete disclosure of material facts. Appellants urge that shareholders who cast uninformed votes in support of a transaction or, in ignorance, take affirmative measures to participate in the transaction should not be precluded from later attacking the transaction. They identify the following facts as ones of which they should have been aware, but of which the Board allegedly failed to inform them. First, appellants state that they were not told that there was a strong possibility that some shareholders would be excluded from participation by virtue of their inability to obtain credit. Second, they express surprise at the fact that the Board members would personally benefit from passage of the conversion plan. Third, appellants contend they did not know that the price they would receive for their units depended to some extent on the financial resources of the Condominium Association. Fourth, appellants assert that no Board member pointed out that the plan varied from By-law 82.

To determine the effect of these alleged omissions, we must look to Delaware state law. Appellants are correct that under Delaware law appellees cannot invoke their approval of the conversion plan if the Board failed properly to inform appellants of all material facts and, as a consequence, appellants' support for the plan was based on reasonable misunderstanding. Delaware law defines an omitted fact as material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote. . . . [or if] disclosure of the omitted fact would have been viewed by a reasonable investor as having significantly altered the`total mix' of infor-

10

mation made available." Bershad v. Curtiss-Wright Corp., 535 A.2d 840, 846 (Del. Super. Ct. 1987) (citations omitted).

Appellees contend that three of the four omissions "should have been eminently clear to any rational adult with a modicum of sense." Appellees' Br. at p. 21. We agree, but with the qualification that all four "omissions" are aptly described by this characterization. Each of the four facts was sufficiently apparent that none of them can provide a basis for the assertion that informational deficiencies undermined the vote or the affirmative actions taken by appellants inconsistent with their present challenge. The "omission" treated separately from the others by appellees is appellants' complaint that the divergence between By-law 82 and the conversion plan was not brought to their attention. This variance relates to compensation methods: By-law 82 anticipated compensation would be based on the value of nonparticipating units after conversion (i.e., the appraised condominium value) and the conversion plan displaced this measure in favor of one based on the value of the units before conversion (i.e., the appraised cooperative value). Appellees emphasize that this difference was not concealed from the shareholders. More than that, copies of the conversion plan, containing only nine paragraphs and spanning just four pages, warned that "[t]he purchase the [sic] price to be paid by the [Condominium Association] for any [nonparticipating] apartment units (and appurtenances thereto) will be their appraised fair market value as cooperative units . . . ." Plan of Complete Liquidation and Dissolution of the Co-op ¶ 5. This is prosaic language, unencumbered by fancy twists and turns; it is clear and its meaning easily grasped. The provision is listed precisely under the paragraph one would expect--that entitled "Purchase of Units by [the Condominium Association]." Ms. Williams is an attorney, Mr. Mouzon has a masters degree in business from the University of Virginia, and Mrs. Mouzon is a school teacher. With these qualifications, appellants must be assumed to have reviewed the terms of the plan and to have comprehended the meaning of the quoted passage. Therefore, while the measure of compensation is surely material information, it was, or should have been, known by appellants.

Even less plausible still are appellants' assertions of informational deficiencies based on the other three factors. With unmistakable clarity, the conversion plan required the Condominium Association to

11

purchase defaulting and nonparticipating units; it is no long leap from this fact to the conclusion that the price the Condominium Association would offer had to depend at least to some degree on its wealth. Similarly, because the ability to obtain financing is a function of the individual shareholder's wealth (whether in terms of income or credit history), there could be little doubt that shareholders with low income or poor credit history might not be able to secure financing. The Board never represented that appellees would offer credit to shareholders otherwise denied access to loans, and, in fact, the conversion plan specifically contemplated the possibility that some shareholders would be unable to participate for failure "to obtain . . . adequate financing." Id. ¶ 5. Finally, since the Board members were also shareholders of the Co-op, and all participating shareholders expected to benefit from the conversion, appellants could not have reasonably missed the fact that the Board members hoped to derive personal gain from purchasing their units. Therefore, all of the information allegedly undisclosed by appellees was, or should have been, fully understood by appellants. Left without any other reason to bypass the doctrines of estoppel and acquiescence, we hold that Ms. Williams is estopped from litigating this claim by her vote in favor of the plan, and that all appellants are barred by their acquiescence in the conversion plan. Accordingly, the district court properly granted summary judgment in favor of appellees on appellants' state law claims.

AFFIRMED

12