[No. B139311. Second Dist., Div. Four. Mar. 14, 2001.]

MARY MARTHA STEWART, Plaintiff and Respondent, v.
COLONIAL WESTERN AGENCY, INC., Defendant and Appellant.

**COUNSEL**

Wolfe & Wolfe and Bruce P. Wolfe for Defendant and Appellant.

Jeffrey J. Doberman for Plaintiff and Respondent.

**OPINION**

**CURRY, J.—**

## BACKGROUND

This is an appeal from an order imposing sanctions in the amount of $2,400 on appellant Colonial Western Agency, Inc.'s counsel.

The underlying matter involves a complaint by respondent Mary Martha Stewart against Colonial Western. Stewart was employed as a senior vice-president for Colonial Western from October 1, 1997, to January 8, 1998. According to Stewart, she left secure employment and turned down another job offer to work for Colonial Western. She contends she received an oral promise of long-term employment, and assurances that she would be treated fairly and would assume significant portions of the chief executive officer's (CEO) job duties and responsibilities when he retired. According to Colonial Western, Stewart was discharged after informing the CEO of the company, William L. Hall, that he had memory problems that prevented her from effectively working with him and further indicating that she could not work with the executive vice-president of the company, Richard Mortillaro, because he was a liar.

Stewart's complaint purportedly alleged claims for breach of oral contract, bad faith discharge, breach of implied covenant of good faith and fair

dealing, misrepresentation, fraud in the inducement, negligent misrepresentation, fraud, promissory estoppel, and declaratory relief.[1] Trial was initially set for January 24, 2000, and the cutoff date for discovery motions was January 10, 2000.

On December 16, 1999, Stewart's attorney, Jeffrey Doberman, took the deposition of Douglas Wiskow, an employee and managing agent of Colonial Western. Marla J. Wolfe, who along with her husband Bruce P. Wolfe and the law firm of Wolfe & Wolfe was counsel of record for Colonial Western, represented Wiskow at the deposition. At the direction of Mrs. Wolfe, Wiskow refused to answer numerous questions pertaining to Hall on the ground that they were not calculated to lead to the discovery of admissible evidence.[2] Doberman concluded his questioning and stated his intention to move to compel further answers.

Doberman received a transcript of the deposition on December 21, 1999. On December 22, he received notice from Mr. Wolfe that he would be unavailable between December 24, 1999, and January 5, 2000, and between January 10, 2000, and January 18, 2000.

---

[1] This is according to the description in respondent's brief. The complaint was not included in the record on appeal.

[2] Specifically, Wiskow was asked and refused to answer the following questions: "After Ms. Stewart's tenure, do you recall conversations [with branch managers regarding Hall's memory problems]?"; "Are you aware that Charlotte Jones [Hall's prior secretary] brought an action against Mr. Hall and Colonial for sexual harassment?"; "Did you have an opportunity to speak to John King regarding Charlotte Jones?"; "And after the January 1994, Northridge earthquake— . . . within a matter of days or weeks—did you have a confrontation with Mr. Hall?"; "Was the Calabasas office tagged after the earthquake . . . if you recall?"; "[A]fter the January 1994 earthquake, did you seek to have the Calabasas office inspected to determine whether or not it was safe for employees to enter?"; "[D]id Mr. Hall threaten to punch you because you were insisting that the office not be opened because it may be unsafe due to the earthquake?"; "Were you aware that other employees were aware of a confrontation between you and Mr. Hall over the safety of the Calabasas office?"; "In a telephone conversation that you had with Ms. Stewart after you learned from Mr. Hall that she was no longer employed there . . . do you recall telling her that you had a confrontation with Mr. Hall over the safety of the Calabasas office as a result of the 1994 Northridge earthquake?" "[H]as Mr. Hall ever shook his fist in your face?"; "Based on your experiences working at Colonial, does William Hall have a temper?"; "Did [Pat Jeli, the Lancaster branch manager,] ever advise you that she had difficulties . . . [d]ealing with Mr. Hall as a female branch manager?"; "During the period of time Ms. Stewart was employed, did you and Pat Jeli have any conversations together where she advised you she was having problems with Mr. Hall as a female branch manager?"

For other questions, Wiskow was instructed by counsel to limit his answer to the time period before Stewart's discharge. Wiskow gave limited answers to the following questions: "Do you have a recollection of your last conversation with Ms. Crawford [Hall's executive assistant] regarding Mr. Hall's memory problems?"; "Have you had conversation with all the branch managers regarding Mr. Hall's memory issues, memory problems?"; and "Have you ever had any conversations with Jo Crawford regarding Mr. Hall' drinking during the workday?"

Doberman sent a letter to Mr. Wolfe dated December 30, 1999, stating in part: "This letter will serve [to] satisfy the requirements of C.C.P., Section 2025 (o) regarding plaintiff's attempt at an informal resolution of the issues surrounding the deposition of Douglas Wiskow. [¶] . . . [¶] I believe it is fair to assume that inasmuch as Ms. Wolfe was the one who directed Mr. Wiskow not to answer, even though I advised Mr. Wiskow I would bring this motion, you have no intention on reversing this position. If this is not the case please contact me immediately so we may further discuss this matter. Otherwise, I will have no alternative but to go forward with the motion to compel the further testimony of Douglas Wiskow." Mr. Wolfe responded with a letter dated January 3, 2000, which stated: "We are always willing to meet and confer, and discuss discovery issues. Your letter of December 30, 1999 certainly does not satisfy the requirements of C.C.P. 2025 (o) and is not an attempt to resolve a discovery dispute. Please advise if you are willing to make any concessions as to your need to have the objectiona[ble] questions answered as phrased, and if you are willing to meet and confer, given the fact that I am leaving the state of California next week and will not be back in the office until January 18, 2000."

On December 23, 1999, before sending the meet and confer letter, Doberman gave notice that he was setting up a hearing on an ex parte application for an order shortening time to hear the motion to compel. The ex parte hearing was set for January 7, 2000. The motion to compel along with the ex parte application were filed January 7, without further discussion between counsel. The court granted the ex parte motion and set the hearing on the motion to compel for January 18.

At the hearing, the court remarked to Mr. Wolfe, who appeared on behalf of Colonial Western: "So you're the Mr. Wolfe that sat in the deposition and instructed the witness not to answer questions because you didn't think they were relevant. Well that's not your role. You are ordered not to instruct the witness not to answer a question during any deposition in this case unless the matter is privileged. The proper procedure is to adjourn the deposition and move for protective order. You don't assume the role of judge and instruct the witness not to answer a question in a deposition. That is a huge no-no." Counsel explained that Mrs. Wolfe, not Mr. Wolfe, had represented the witness at the deposition. The court stated on the record the tentative ruling that sanctions would be awarded "against defendant's attorney," not specifying counsel by name. At the end of the hearing, after further finding that the attempted meet and confer complied with the statute, the court ruled that the tentative ruling would stand.

The minute order filed January 18, 2000, stated that the motion to compel was granted and awarded sanctions in the amount of $2,400 "payable within 20 days by defendant's counsel, Bruce P. Wolfe, only."

Notice of appeal "from the Judgment of the Court of January 18, 2000 imposing sanctions upon Defendants attorneys in the amount of $2,400" was filed February 14, 2000. According to the opening brief on appeal, "the case settled but the parties reserved the right to proceed on this appeal as part of the settlement and stipulation on the record in the Court below.". The record contains no judgment or order of dismissal and no indication that either was ever entered.

In the opening brief, the Wolfes argued among other things that the order compelling further responses and awarding sanctions was erroneous because the sanction order was directed at the wrong attorney. After receiving the opening brief, respondent requested a nunc pro tunc correction of the minute order. The trial court corrected the order on September 20, 2000, while appeal was pending, by deleting the words "Bruce P. Wolfe."

■ On February 1, 2001, we sent a Government Code letter asking why the appeal should not be dismissed on the ground that the sanction order was not an appealable order in that the amount of the sanction did not exceed $5,000. At oral argument, counsel for both sides stated that a settlement had been reached and a request for voluntary dismissal entered with a stipulation that the sanction order would be appealed. Ordinarily, a plaintiff's voluntary dismissal is deemed to be nonappealable on the theory that dismissal of the action is a ministerial action of the clerk, not a judicial act. (*Gray v. Superior Court* (1997) 52 Cal.App.4th 165, 170 [60 Cal.Rptr.2d 428]; *Denney v. Lawrence* (1994) 22 Cal.App.4th 927, 930 [27 Cal.Rptr.2d 556].) "It has also been held that the defendant cannot appeal the plaintiff's dismissal because the dismissal 'has the effect of an absolute withdrawal of [the plaintiff's] claim and leaves the defendant as though he had never been a party.' " (*Gray v. Superior Court, supra*, at p. 170, quoting *Cook v. Stewart McKee & Co.* (1945) 68 Cal.App.2d 758, 761 [157 P.2d 868].) However, appellate courts treat a voluntary dismissal with prejudice as an appealable order if it was entered after an adverse ruling by the trial court in order to expedite an appeal of the ruling. (*Casey v. Overhead Door Corp.* (1999) 74 Cal.App.4th 112, 116, fn. 1 [87 Cal.Rptr.2d 603]; *Denny v. Lawrence, supra*, at p. 930, fn. 1; *Ashland Chemical Co. v. Provence* (1982) 129 Cal.App.3d 790, 793 [181 Cal.Rptr. 340].) Since the parties are in agreement that the dismissal was entered with the stipulation that appeal from the trial court's order imposing sanctions was to follow, we are satisfied that an appealable order exists.

## DISCUSSION

### I

"Unless otherwise limited by order of the court in accordance with [the discovery statutes], any party may obtain discovery regarding any matter,

not privileged, that is relevant to the subject matter involved in the pending action . . . if the matter either is itself admissible in evidence or appears reasonably calculated to lead to the discovery of admissible evidence. Discovery may relate to the claim or defense of the party seeking discovery or of any other party to the action. . . ." (Code Civ. Proc., § 2017, subd. (a).)

■ "For discovery purposes, information is relevant if it 'might reasonably assist a party in *evaluating* the case, *preparing* for trial, or *facilitating* settlement . . . .' [Citation.] Admissibility is *not* the test and information unless privileged, is discoverable if it might reasonably *lead* to admissible evidence. [Citation.] These rules are applied liberally in favor of discovery [citation], and (contrary to popular belief), fishing expeditions *are* permissible in some cases." (*Gonzalez v. Superior Court* (1995) 33 Cal.App.4th 1539, 1546 [39 Cal.Rptr.2d 896], quoting Weil & Brown, Cal. Practice Guide, Civil Procedure Before Trial (The Rutter Group 1994) ¶ 8:66.1, p. 8C-1.)

■ The Wolfes contend that the questions that Wiskow was instructed not to answer were objectionable on the ground that they would not produce admissible evidence and were not reasonably calculated to lead to admissible evidence because they involved Hall's character and were directed to the period after Stewart's termination. We disagree.

The principal issues in a claim for breach of contract wrongful termination are the existence of an express or implied contract of employment and the existence of good cause for termination. Colonial Western's defenses included the contention that Hall terminated Stewart for good cause due to insubordination and refusal to work with her superiors. Stewart was entitled to test the truth of this contention by exploring Hall's dealing with his subordinates. If Hall had difficulty treating subordinates fairly, particularly female subordinates, this could lend credence to Stewart's claim that she was terminated without good cause and that the basis asserted for Stewart's termination by Colonial Western was pretextual.

Contrary to the Wolfes' assertion that the questions pertained to Hall's "character," most of the questions Wiskow was instructed not to answer sought information about Hall's dealings with subordinates such as his prior secretary, a female branch manager, and the witness himself. The questions seemed designed to elicit information concerning Hall's employment practices and policies and his methods of dealing with employment-related issues. The questions could have led to evidence admissible in the action, assisting Stewart in her claim by establishing that Hall administered unjustified discipline to or unfairly criticized other employees with sufficient

regularity to establish a general practice. The fact that some of the specific incidents counsel wished to discuss with Wiskow took place shortly after Stewart's termination rather than before has no significant bearing on their potential relevance. The questions could have led to discovery of evidence useful to Stewart in challenging Colonial Western's contention that her termination was based on good cause.

Moreover, even were the questions designed to elicit irrelevant evidence, irrelevance alone is an insufficient ground to justify preventing a witness from answering a question posed at a deposition. Code of Civil Procedure section 2025, subdivision (m), governing deposition objections, divides objectionable questions into three categories. Subdivision (m)(1) applies to questions delving into privileged areas and provides that to protect privileged information, "a specific objection to its disclosure" must be "timely made during the deposition." Subdivision (m)(1) thus sanctions use of an objection coupled with an instruction not to answer in order to protect privileged information from disclosure.

Code of Civil Procedure section 2025, subdivision (m)(2) applies to questions containing errors or irregularities that might be cured if promptly brought to counsel's attention, such as errors in the form of the question. Objection to these types of missteps is "waived unless a specific objection to them is timely made during the deposition." Subdivision (m)(2) makes clear that counsel should not instruct the deponent not to answer such objectionable questions, expressly stating that "[u]nless the objecting party demands the taking of the deposition be suspended to permit a motion for a protective order under subdivision (n), the deposition shall proceed subject to the objection."

Code of Civil Procedure section 2025, subdivision (m)(3) governs inquiry into irrelevant and immaterial matters and provides: "Objections to the competency of the deponent, or to the relevancy, materiality, or admissibility at trial of the testimony or of the materials produced *are unnecessary* and are not waived by failure to make them before or during the deposition." (Italics added.) In other words, the deponent's counsel should not even raise an objection to a question counsel believes will elicit irrelevant testimony at the deposition. Relevance objections should be held in abeyance until an attempt is made to use the testimony at trial.

Code of Civil Procedure section 2025, subdivision (n) goes on to state that the deposition may be suspended if "any party attending the deposition or the deponent demands the taking of testimony be suspended to enable that party or deponent to move for a protective order on the ground that the

examination is being conducted in bad faith or in a manner that unreasonably annoys, embarrasses, or oppresses that deponent or party." Deposing counsel's insistence on inquiring into irrelevant areas could justify suspension under this standard, but only if it reaches the point where it could legitimately be said that counsel's intent was to harass, annoy, embarrass, or oppress. Taken as a whole, these provisions clearly contemplate that deponents not be prevented by counsel from answering a question unless it pertains to privileged matters or deposing counsel's conduct has reached a stage where suspension is warranted. The fact that suspension is available only where an interrogation into improper matters reveals an underlying purpose to harass, annoy, etc., indicates that witnesses are expected to endure an occasional irrelevant question without disrupting the deposition process.[3]

Misinterpreting the process outlined in the statute and the local rules, the Wolfes contend that because suspension is available to the deponent and his attorney only where the questioning can be characterized as an attempt to harass, annoy, embarass, or oppress, they had no obligation to seek a protective order, and that the trial court erred in stating that such an obligation existed. As we have indicated, we do not agree that the questions at issue were designed to elicit irrelevant or inadmissible testimony. Mrs. Wolfe apparently did believe this was the case. The transcript of the deposition reveals she objected to more than a dozen questions within a relatively short period of time. If her assessment that this line of questioning was wholly irrelevant was accurate, that would have been sufficient evidence of harassment to justify suspending the deposition under Code of Civil Procedure section 2025, subdivision (n) and asking the court for a protective order. Of course, the court might not have agreed with Mrs. Wolfe's characterization of the questioning, and sanctioned her for the cost of reopening an improperly suspended deposition *and* for improperly seeking a protective order. But if the Wolfes truly believed that deposing counsel was intent on pursuing a completely immaterial course of questioning, that is the burden—and risk—they were obligated to undertake.

## II

The Wolfes further contend that counsel for Stewart failed to engage in a good faith effort to meet and confer. At the hearing on the

---

[3]Our understanding is supported by rule 7.12(e)(9) of the Superior Court of Los Angeles County, Local Rules, which specifically instructs the deponent's counsel "not [to] direct deponent to refuse to answer questions unless they seek privileged information or are manifestly irrelevant or calculated to harass." The Wolfes state in their reply brief that "[i]t is . . . questionable whether the Superior Court Rule is consistent with custom and usage among Trial lawyers." Counsel would be well advised to conform their behavior to the rules, which have the force of law.

motion to compel, the trial court specifically found that Doberman's meet-and-confer efforts "complie[d] with the statute."

■ "The Discovery Act requires that, prior to the initiation of a motion to compel, the moving party declare that he or she has made a serious attempt to obtain 'an informal resolution of each issue.' (§ 2025, subd. (o) . . . .) This rule is designed 'to encourage the parties to work out their differences informally so as to avoid the necessity for a formal order. . . .' (*McElhaney* v. *Cessna Aircraft Co.* (1982) 134 Cal.App.3d 285, 289 [184 Cal.Rptr. 547].) This, in turn, will lessen the burden on the court and reduce the unnecessary expenditure of resources by litigants through promotion of informal, extrajudicial resolution of discovery disputes. [Citations.]" (*Townsend v. Superior Court* (1998) 61 Cal.App.4th 1431, 1435 [72 Cal.Rptr.2d 333].)

"A determination of whether an attempt at informal resolution is adequate . . . involves the exercise of discretion. The level of effort at informal resolution which satisfies the 'reasonable and good faith attempt' standard depends upon the circumstances. In a larger, more complex discovery context, a greater effort at informal resolution may be warranted. In a simpler, or more narrowly focused case, a more modest effort may suffice. The history of the litigation, the nature of the interaction between counsel, the nature of the issues, the type and scope of discovery requested, the prospects for success and other similar factors can be relevant. Judges have broad powers and responsibility to determine what measure and procedures are appropriate in varying circumstances." (*Obregon v. Superior Court* (1998) 67 Cal.App.4th 424, 431 [79 Cal.Rptr.2d 62].) "A trial judge's perceptions on such matters, inherently factual in nature at least in part, must not be lightly disturbed." (*Ibid.*)

■ Apart from anything pertaining to the history of the litigation and the prior interaction between the parties of which the trial court may have been aware, a number of factors appearing in the record support the finding of good faith efforts under the circumstances. The objections were made during a deposition so counsel had an opportunity to discuss the matter face-to-face at the time the discovery dispute arose.[4] The issue was relatively simple: Were questions pertaining to Hall's treatment of other employees

---

[4]The deposition transcript indicates that an off-the-record discussion was held between Mrs. Wolfe and Doberman at the time the objection and instruction not to answer was first asserted. This distinguishes our situation from that in *Townsend v. Superior Court, supra,* 61 Cal.App.4th 1431, where the court concluded that "bickering with deponent's counsel at a deposition" did not represent a good faith attempt to "talk the matter over, compare their views, consult, and deliberate." (*Id.* at p. 1439.) In reaching this conclusion, the court noted: "Depositions differ from other manner of discovery mechanisms in that counsel for both

and his behavior toward employees after Stewart's termination designed to elicit relevant evidence? There was need for immediate action because of the upcoming trial date and cutoff dates for discovery and discovery motions. Scheduling a face-to-face meeting or telephonic conference was complicated by the fact that Mr. Wolfe had announced two lengthy periods prior to trial, one lasting 13 days and the other nine days, in which he would not be available. This left respondent's counsel with no time to conduct a lengthy meet and confer and get a discovery motion on file before the deadline. In his letter to Doberman, Mr. Wolfe did not himself suggest a date or time at which he would be available and did not indicate any intention to compromise. On these facts, the trial court did not err or abuse its discretion in finding that the efforts undertaken by Stewart's counsel to meet and confer were adequate.

## DISPOSITION

The January 18, 2000, order imposing sanctions on Colonial Western's counsel as corrected nunc pro tunc on September 20, 2000, is affirmed.

Vogel (C. S.), P. J., and Hastings, J., concurred.

---

parties are present. The immediacy of counsel allows for the instantaneous discussion of an objection and attempts at informal resolution. This proposition has a certain facial appeal and the support of at least one commentator." (*Id.* at p. 1436, citing Weil & Brown, Cal. Practice Guide: Civil Procedure Before Trial (The Rutter Group 1997) ¶ 8:812, p. 8E-97.) The court rejected "an absolute rule requiring that informal resolution must always await the conclusion of a deposition." (*Townsend,* at p. 1438.) As long as there was "a serious effort at negotiation and informal resolution," the court believed it was appropriate to "leave it to the parties to determine the proper time, manner, and place for such discussion." (*Ibid.*)