[No. B157329. Second Dist., Div. Seven. Apr. 23, 2003.]

WALTER J. NEUBAUER et al., Plaintiffs and Appellants, v.
ANDREW GOLDFARB et al., Defendants and Respondents.

## COUNSEL

Gibson, Dunn & Crutcher, Phillip L. Bosl, Theodore J. Boutrous, Jr., William E. Thomson and Julian W. Poon for Plaintiffs and Appellants.

O'Melveny & Myers, David P. Enzminger and Paula E. Ambrosini for Defendants and Respondents.

## OPINION

**JOHNSON, J.**—A minority shareholder in a closely held corporation brought this action against the corporation, its directors and majority shareholders, alleging breach of fiduciary duty, fraud, negligence and false statements in the purchase of securities in violation of Corporations Code section 25401. The complaint also charged the president and chief executive officer of the corporation with breach of an oral contract. The trial court granted summary adjudication to the defendants on all but the breach of contract cause of action and denied the plaintiff's motion to amend his complaint. After plaintiff dismissed his breach of contract cause of action the trial court

entered judgment for the defendants on the remaining causes of action based on the previous summary adjudication.

We reverse the judgment in favor of defendants Andrew and Steven Goldfarb on the first four causes of action and otherwise affirm.

### FACTS AND PROCEEDINGS BELOW

In 1989, plaintiff Walter J. Neubauer and the Neubauer Family Trust (Neubauer) purchased 40 percent of the shares of HCC Industries, Inc. (HCC), for approximately $1 million. The remaining 60 percent of the corporation was owned by Andrew Goldfarb, president and chief executive officer, his brother Steven, and Christopher Bateman, chief financial officer.

Negotiations for the sale of HCC began in 1995. In order to facilitate the negotiation and closing of a sale, Neubauer agreed to sell his shares to HCC for $18 million. This agreement was amended twice in the ensuing months so that HCC ultimately purchased Neubauer's stock for $14.4 million, or approximately $70 per share. Less than 90 days later, defendants sold 65 percent of HCC for approximately $347 per share.

Believing defendants had intentionally misled him as to the value of his shares, Neubauer brought this action against HCC, the Goldfarbs and Bateman for fraud and related torts and against Andrew Goldfarb individually for breach of contract.[1]

The trial court granted defendants' motion for summary adjudication on the tort causes of action but denied the motion with respect to the breach of contract action against Goldfarb. The parties' factual showings supporting and opposing the motion for summary adjudication are discussed in detail below.[2] The court also denied Neubauer's motion for leave to add a cause of action against Goldfarb for breach of fiduciary duty separate from the breach alleged against defendants collectively. Following these rulings, Neubauer entered into settlement agreements with HCC and Bateman on the tort claims and with Goldfarb on the breach of contract claim which Neubauer voluntarily dismissed with prejudice. The breach of contract claim having been settled, the trial court entered judgment for the defendants based on its previous summary adjudication. Neubauer filed a timely notice of appeal.

---

[1]References in this opinion to defendants are to the Goldfarbs and Bateman; references to Goldfarb are to Andrew Goldfarb unless otherwise stated.

[2]See pages 59-62, *post.*

## DISCUSSION

### I. *The Judgment in Favor of the Goldfarbs on the First Five Causes of Action Is Appealable. The Order Denying Leave to Amend the Complaint to Add a New Cause of Action Against Andrew Goldfarb Is Not Appealable.*

The Goldfarbs contend Neubauer cannot appeal the judgment in their favor on the first five causes of action or the order denying Neubauer's motion to add a cause of action for breach of fiduciary duty against Andrew Goldfarb.

■ The contention the judgment on the first five causes of action is not appealable is based on the settlement agreement between Neubauer and defendants HCC and Bateman. The Goldfarbs reason Neubauer, by settling with two joint tortfeasors, HCC and Bateman, "received payment in full" on his claims under the first five causes of action and therefore has nothing to gain from a reversal of the judgment as to the Goldfarbs. This argument would make sense if HCC and Bateman had satisfied a *judgment* against them and the Goldfarbs as joint tortfeasors. It makes sense that if one joint tortfeasor satisfies a judgment against all joint tortfeasors the judgment creditor cannot obtain a double recovery by collecting the same judgment from another of the tortfeasors.[3] But a *settlement* with one joint tortfeasor does not bar the plaintiff from pursuing his claim for damages against the other joint tortfeasors. Instead, the compensation paid to the plaintiff by one tortfeasor is deducted from the award obtained from another.[4]

Code of Civil Procedure section 877 states: "Where a release . . . is given in good faith before verdict or judgment to one or more of a number of tortfeasors claimed to be liable for the same tort, . . . [¶] [i]t shall not discharge any other such party from liability unless its terms so provide, but it shall reduce the claims against the others in the amount stipulated by the release . . . ." The settlement in the present case specifically excluded the Goldfarbs from the release. Therefore, the Goldfarbs are still potentially liable to Neubauer on the first through fifth causes of action. Any money judgment Neubauer might obtain against the Goldfarbs, however, would have to be reduced by the amount paid in settlement by HCC and Bateman.[5]

There is no merit to the Goldfarbs' contention they cannot be held individually liable for fraud, negligence and breach of fiduciary duty with

---

[3]See *Winzler & Kelly v. Superior Court* (1975) 48 Cal.App.3d 385, 394 [122 Cal.Rptr. 259].
[4]*May v. Miller* (1991) 228 Cal.App.3d 404, 410 [278 Cal.Rptr. 341].
[5]*May v. Miller, supra*, 228 Cal.App.3d at page 410.

respect to the purchase of Neubauer's shares by the corporation in which they were the directors and majority shareholders.[6]

■ Goldfarb contends the order denying leave to add a new cause of action against him is not appealable because he subsequently settled the breach of contract claim against him and the proposed breach of fiduciary duty claim is, by Neubauer's own admission, based on the same primary right. On this point we agree.

Neubauer and Goldfarb entered into a settlement agreement in which Goldfarb agreed to pay $100,000 to Neubauer and Neubauer agreed to dismiss his breach of oral contract claim against Goldfarb with prejudice. The agreement specifically states this settlement in no way affects "Neubauer's rights, if any, to pursue resolution of his [breach of fiduciary duty claim] on appeal or otherwise." Generally, appellate courts will treat a voluntary dismissal with prejudice as an appealable order if the appellant entered the dismissal after an adverse ruling by the trial court in order to facilitate an appeal from the ruling.[7] The settlement agreement between Goldfarb and Neubauer appears to have been drawn up with this rule in mind. In return for a $100,000 payment from Goldfarb, Neubauer released Goldfarb from liability on the breach of oral contract claim but reserved the right to appeal the trial court's denial of leave to amend his complaint to allege a cause of action against Goldfarb for a breach of fiduciary duty separate from the breach of duty alleged against all defendants.

We cannot apply this general rule here, however, because Neubauer has made a judicial admission the original breach of oral contract claim and the breach of fiduciary duty claim he seeks to add "seek redress for the *same* injury." (Italics by Neubauer.) In his brief in support of leave to amend his complaint, Neubauer told the trial court his "proposed claim for breach of fiduciary duty is based on the *same* injury—defined in terms of primary rights—as [his] live claim for breach of oral contract." (Italics by Neubauer) He went on to state his " 'various theories of recovery' are nothing more than 'different legal theories of the nature of the single wrong.' " Thus, by his own admission, Neubauer has been fully compensated for the injury to the primary right in issue. Regardless of the number of legal theories

---

[6]See, e.g., *Fisher v. Pennsylvania Life Co.* (1977) 69 Cal.App.3d 506, 513 [138 Cal.Rptr. 181] (complaint stated causes of action against directors and majority shareholders for fraud and breach of fiduciary duty).

[7]*Stewart v. Colonial Western Agency, Inc.* (2001) 87 Cal.App.4th 1006, 1012 [105 Cal.Rptr.2d 115].

Neubauer might be able to plead, he is entitled to only one recovery for the violation of one primary right.[8]

For the reasons stated above, we proceed to consider only Neubauer's appeal from the judgment in favor of the Goldfarbs on the first through fifth causes of action.

II. *Neubauer Did Not Waive the Goldfarbs' Fiduciary Duties as Directors and Majority Shareholders, Nor Did He Release Them from Tort Liability.*

A defendant may succeed on a motion for summary adjudication by demonstrating the targeted cause of action has no merit.[9] "A defendant . . . has met his or her burden of showing that a cause of action has no merit if that party has shown that one or more elements of the cause of action . . . cannot be established or that there is a complete defense to that cause of action."[10]

The Goldfarbs sought summary adjudication of the breach of fiduciary duty cause of action on the ground Neubauer knowingly and intelligently waived any fiduciary duty the Goldfarbs owed to him as directors or majority shareholders when he agreed to sell his shares to HCC. They also contended all of Neubauer's tort claims are barred because in the agreement to sell his shares Neubauer released them from liability on any claim based on their subsequent sale of HCC, which resulted in their receiving a higher price for their shares than Neubauer received. We reject both these contentions.

A. *California Law Applies to the Waiver and Release Provisions in the Agreement.*

The agreement giving HCC an option to buy Neubauer's shares contained a choice of law provision stating: "This agreement shall be governed by the laws of the State of California, except that the rights of the parties as stockholders, and the duties of the officers, directors, and stockholders shall be construed under Delaware corporate law."

Accordingly, we will apply California law in determining the waiver and release issues.

---

[8]See *May v. Miller, supra*, 228 Cal.App.3d at page 410.

[9] Code of Civil Procedure section 437c, subdivision (f)(1).

[10]Code of Civil Procedure section 437c, subdivision (p)(2).

B. *The Purported Waiver of the Goldfarbs' Fiduciary Duties Is Void Under Civil Code Section 1668 and as Against Public Policy.*

The agreement between Neubauer and HCC provided: "Seller acknowledges that neither HCC nor its officers, directors or controlling shareholders have any fiduciary duty to seller or HCC in connection with the execution of this agreement or a sale including, but not limited to, the fairness of the overall consideration or the allocation thereof." The agreement further acknowledged "[s]eller . . . has requested and received such information in connection with the execution of this agreement as he believes to be necessary in order to make an informed decision to enter into this agreement and to bind himself as set forth herein" and "[t]he provisions hereof have been thoroughly reviewed by all parties and have been the subject of negotiations."

█   The Goldfarbs argue these recitals evidence a knowing and voluntary waiver of any fiduciary duty they might otherwise have owed to Neubauer in connection with HCC's purchase of his stock.

In response to Neubauer's contention public policy precludes a waiver of fiduciary duty the Goldfarbs cite two cases, *Colton v. Stanford*[11] and *A. J. Industries, Inc. v. Ver Halen*,[12] which they claim hold to the contrary. These cases are inapposite. In *Colton*, the court found there was no trust relationship between the plaintiff and the defendants; therefore there was no fiduciary duty to waive.[13] Similarly, in *A. J. Industries* the settlement agreement the plaintiff corporation sought to rescind was based on its former chairman's breach of fiduciary duty to the corporation. The court characterized this agreement as an arm's-length transaction[14] and concluded the defendant did not owe a fiduciary duty to the corporation in negotiating his own resignation for breach of fiduciary duty.[15]

We find the better view on the issue of waiver of fiduciary duty is the one expressed in *Cohen v. Kite Hill Community Assn.*[16] In *Cohen*, residents of Kite Hill sued their homeowners association for failure to enforce standards contained in the declaration of covenants, conditions and restrictions. The association claimed that under the declaration it was immune from liability

---

[11]*Colton v. Stanford* (1890) 82 Cal. 351 [23 P. 16].
[12]*A. J. Industries, Inc. v. Ver Halen* (1977) 75 Cal.App.3d 751 [142 Cal.Rptr. 383].
[13]*Colton v. Stanford, supra*, 82 Cal. at pages 372, 380.
[14]*A. J. Industries, Inc. v. Ver Halen, supra*, 75 Cal.App.3d at page 759.
[15]*A. J. Industries, Inc. v. Ver Halen, supra*, 75 Cal.App.3d at page 758.
[16]*Cohen v. Kite Hill Community Assn.* (1983) 142 Cal.App.3d 642 [191 Cal.Rptr. 209].

for damage caused by any "course of action, act, [or] omission" on its part.[17] The Court of Appeal held the association owed a fiduciary duty to the residents which was not cancelled out by the exculpatory clause in the declaration.

The court began by observing: "The law has traditionally viewed with disfavor attempts to secure insulation from one's own negligence or wilful misconduct[.]"[18] "Furthermore," the court noted, "it is the express statutory policy of this state that '[a]ll contracts which have for their object, directly or indirectly, to exempt anyone from the responsibility for his own fraud or willful injury to the person or property of another, or violation of law, whether willful or negligent, are against the policy of the law.' (Civ. Code, § 1668.)"[19] The court found "[t]his public policy applies with added force when the exculpatory provision purports to immunize persons charged with a fiduciary duty from the consequences of betraying their trusts. . . ."[20] Moreover, "the California Supreme Court has evinced a clear policy of enforcing only those exculpatory provisions which do not affect 'the public interest.' . . ."[21] Applying the Supreme Court's criteria for determining whether a business or transaction affects a public interest, the *Cohen* court concluded the exculpatory clause did not relieve the homeowners association from liability for breach of its fiduciary duties because it occupied "a particularly elevated position of trust [due to] the many interests it monitors and services it performs."[22]

Applying the reasoning of *Cohen* to the case before us we conclude the agreement does not cancel out the Goldfarbs' fiduciary duties as directors and majority shareholders.

Initially, we agree with Neubauer a breach of fiduciary duty constitutes a "willful injury to the . . . property of another" under Civil Code section 1668 and therefore cannot be contractually excused. Furthermore, the buying and selling of corporate stock are transactions which affect a public interest. Such transactions are heavily regulated[23] and, in cases such as this involving the buyout of minority shareholders in a private close corporation, the

---

[17]*Cohen v. Kite Hill Community Assn., supra,* 142 Cal.App.3d at page 650.

[18]*Cohen v. Kite Hill Community Assn., supra,* 142 Cal.App.3d at page 654.

[19]*Cohen v. Kite Hill Community Assn., supra,* 142 Cal.App.3d at page 654.

[20]*Cohen v. Kite Hill Community Assn., supra,* 142 Cal.App.3d at page 654, citations omitted.

[21]*Cohen v. Kite Hill Community Assn., supra,* 142 Cal.App.3d at pages 654-655, citation omitted.

[22]*Cohen v. Kite Hill Community Assn., supra,* 142 Cal.App.3d at page 655, applying the factors set out in *Tunkl v. Regents of the University of California* (1963) 60 Cal.2d 92, 96, 98-101 [32 Cal.Rptr. 33, 383 P.2d 441, 6 A.L.R.3d 693].

[23]See *Tunkl v. Regents of University of California, supra,* 60 Cal.2d at pages 98, 100.

controlling shareholders possess a decisive advantage of bargaining strength.[24] Additional evidence waiver of a director's fiduciary duty is against public policy is found in section 204, subdivision (a)(10) of the Corporations Code, which provides articles of incorporation "may not eliminate or limit the liability of directors [to the corporation] for acts or omissions that involve intentional misconduct . . . or that involve the absence of good faith on the part of the director . . . ."

We conclude, therefore, waiver of corporate directors' and majority shareholders' fiduciary duties to minority shareholders in private close corporations is against public policy and a contract provision in a buy-sell agreement purporting to effect such a waiver is void.

Even if the Goldfarbs' fiduciary duty validly could be waived, a waiver requires the knowing and intelligent relinquishment of a right.[25] A triable issue of fact exists as to whether Neubauer's purported waiver was fully informed. The agreement states Neubauer "has requested and received such information in connection with the execution of this agreement as he believes to be necessary in order to make an informed decision to enter into this agreement and to bind himself as set forth herein." Neubauer's declaration in opposition to summary adjudication claims, however, after he entered into the agreement he discovered the Goldfarbs had withheld material information relevant to the value of his stock.[26] Obviously Neubauer had to rely on the Goldfarbs' good faith representation they had provided him with all the information necessary "to make an informed decision to enter into this agreement" including the waiver clause. If it turned out the Goldfarbs withheld material information a trier of fact could find Neubauer's purported waiver was not fully informed.[27]

For these reasons the Goldfarbs were not entitled to summary adjudication on the breach of fiduciary duty cause of action based on Neubauer's purported waiver of their fiduciary duty.

---

[24]This imbalance in bargaining strength stems from the illiquidity of the shares of a close corporation and the majority's failure to share material valuation information with the minority. O'Neal, *Oppression of Minority Shareholders: Protecting Minority Rights* (1986/1987) 35 Clev. St. L.Rev. 121, 123, 130 (hereafter *Oppression of Minority Shareholders.*)

[25]*A. J. Industries, Inc. v. Ver Halen, supra,* 75 Cal.App.3d at page 759.

[26]See discussion at pages 59-62, *post.*

[27]We note the agreement does not contain disclaimers concerning any representations by the Goldfarbs outside the four corners of the agreement or disclaiming reliance on any representations not memorialized in the agreement.

## C. *The Release Provisions in the Agreement Do Not Shield the Goldfarbs from Liability.*

■ The agreement contained three clauses the Goldfarbs contend release them from any tort liability in connection with HCC's purchase of Neubauer's stock.

Paragraph 3 of the agreement stated: "Seller is desirous of having HCC sold and selling his stock, even if such sale results in his receiving a smaller amount per share than the other stockholders, in part because of his belief as to the contribution to the success of HCC made by the other stockholders."

More specifically, paragraph 5.8 recited: "Seller understands and acknowledges that certain of the other stockholders of HCC will receive, in a sale, compensation and payments both for their shares and otherwise that will have the effect of them receiving a proportionate amount of the aggregate consideration in the sale that is greater per share than seller will receive hereunder. Seller agrees, subject to the other conditions of this agreement being met, not to assert any claim, or to institute any legal, equitable, administrative or other proceedings against HCC or any of its affiliates or stockholders as a result of such difference."

Finally, in reference to negotiations for the sale of HCC then in progress, paragraph 5.2 provided: "Seller acknowledges and agrees that the final form of a sale may be substantially different from what has been disclosed to him as the present form of sale currently under negotiation, due to factors such as, but not limited to, negotiations, due diligence, tax restructuring, changes in the post-sale ownership of HCC by the other stockholders, and other factors, and that it could involve a different buyer. Such final structure may have the effect of being more favorable to individual stockholders of HCC than to seller." Having acknowledged the defendants might obtain a more favorable price for their shares than he, Neubauer agreed that "[s]o long as seller receives the cash amount contemplated by this agreement, seller will assert no claim against HCC or any of its affiliates or stockholders in connection herewith."

None of these provisions released the Goldfarbs from liability for breach of fiduciary duty, fraud or negligent misrepresentation in connection with HCC's purchase of Neubauer's stock. The quoted clauses simply say Neubauer will not sue the Goldfarbs merely because they ultimately obtain more for their HCC shares than Neubauer received for his. But Neubauer's tort causes of action are not based on a claim the Goldfarbs breached a duty to share the ultimate proceeds from the sale of HCC with him on a pro rata

basis.[28] Rather, his claim is that in negotiating the purchase of his HCC shares the Goldfarbs breached their duties to disclose, and not misrepresent, all material facts bearing on the value of those shares at the time he sold them.

Furthermore, an agreement "not to assert any claim, or to institute any legal, equitable, administrative or other proceedings against HCC or any of its affiliates or stockholders as a result of such difference" is a general release which does not apply to unknown claims.[29] Neubauer contended in opposition to the motion for summary adjudication he did not know when he entered into the agreement to sell his shares and the amendments thereto the Goldfarbs had withheld material information from him and misrepresented other information. He stated had he been aware of the Goldfarbs' bad faith and deceit he would not have consented to sell his shares for the amounts agreed to. Thus, a triable issue of fact is raised as to whether Neubauer's purported release of liability covers his claims for breach of fiduciary duty, fraud and negligence.

We conclude, therefore, the Goldfarbs are not entitled to summary adjudication based on the purported release contained in the agreement.

III. *Triable Issues of Fact Exist as to Whether the Goldfarbs Made Material False or Misleading Statements or Failed to Disclose Material Facts Bearing on the Value of Neubauer's Stock.*

The Goldfarbs maintained they were entitled to summary adjudication on the breach of fiduciary duty, fraud and negligence causes of action because Neubauer could produce no evidence they made material false or misleading statements or failed to disclose any material facts bearing on the value of Neubauer's shares. In addressing this contention we apply Delaware law.[30]

A. *The Parties' Factual Showings.*

In 1994, Neubauer and Goldfarb agreed Goldfarb would begin to pursue the sale of HCC. Any sale would be conditioned on Neubauer receiving his pro rata share, i.e., 40 percent, of the proceeds but in no event less than $5 million.

---

[28]The viability of such a claim is discussed in Arnold, *Shareholder Duties Under State Law* (1992) 28 Tulsa L. J. 213, 258-261.

[29]Civil Code section 1542 states: "A general release does not extend to claims which the creditor does not know or suspect to exist in his favor at the time of executing the release, which if known by him must have materially affected his settlement with the debtor."

[30]See page 54, *ante.* For this reason we agree the Goldfarbs were entitled to summary adjudication on Neubauer's cause of action for violation of the California Corporations Code section 25401.

The following year, defendants entered into negotiations with several companies for the sale of HCC. The first negotiation was with Emerson Electric, which offered $40 million for the company. Defendants communicated this offer to Neubauer but they all agreed to reject it because of strings Emerson attached to the purchase. Neubauer testified, however, defendants did not share with him the fact they told this prospective purchaser the projected operating profit HCC would earn in 1995 was $9 million and $11 million for 1996. The next offer came from the Schott Corporation, which bid $25 million for 50 percent of HCC's shares. According to Neubauer, the defendants told him the $25 million offer was for 100 percent of the company.

When negotiations with Schott stalled, defendants began discussions with Bain Capital Partners. Neubauer testified that in the course of defendants' negotiations with Bain, Goldfarb informed him he needed to sign an agreement to sell his shares for a specific amount because Bain was unwilling to put substantial work into due diligence for the transaction unless it was assured Neubauer would follow through on the deal. At the time, Neubauer believed his shares were worth $22 million, based on defendants' representation Bain was willing to pay $74 million for HCC. Nevertheless, Neubauer stated he agreed to accept $18 million for his shares "based on my belief that defendants were being fair to me and would make financial arrangements benefiting the employees of HCC industries who were not shareholders[.]"

In October 1995, Neubauer signed an agreement giving HCC a two-year option to purchase his shares for $18 million.

A few months after Neubauer agreed to sell his stock to HCC for $18 million, Bain reduced its offer for the company from $74 million to $64 million. Goldfarb testified he communicated this new offer to Neubauer and told Neubauer accepting this offer would require him to accept $14 million as his pro rata share of the proceeds. Neither Goldfarb nor Neubauer wanted to take less for their stock but they agreed they would think about Bain's new offer and Neubauer would get back to Goldfarb with his decision. When Goldfarb did not hear from Neubauer for several weeks he told Bain "the deal was dead." Shortly afterward Neubauer called Goldfarb and told him we would take $17 million for his shares. Goldfarb told Neubauer he had already informed Bain there was no deal.

Despite telling Goldfarb he would accept no less than $17 million for his shares, a month later, following negotiations with defendants, Neubauer agreed to lower the option price of his shares to $15 million. Neubauer explained he agreed to this $3 million reduction because he believed the

defendants "were treating me fairly" and he mistakenly believed "the price offered by Bain might be fair."

Soon after Neubauer agreed to the reduced option price for his shares, Goldfarb awarded himself a bonus of $2.5 million and awarded Bateman a bonus of $642,500. According to Neubauer, defendants did not inform him of these bonuses.

Goldfarb also continued his efforts to find a buyer for HCC. In April 1996, Goldfarb met with representatives of an investment banker, BA Partners, who told Goldfarb there were a number of potential buyers for HCC. BA Partners also advised Goldfarb the cost of acquiring Neubauer's 40 percent stake in the company would go up if HCC continued to do well. Again, Neubauer claims he was not informed of this meeting or the opinions expressed by BA Partners.

Although there is no evidence BA Partners discussed the value of HCC at the April 1996 meeting, a short time later Steven Goldfarb wrote to Neubauer stating "[w]e now know that no one will purchase the company at the price we had hoped and that until we resolve our serious [environmental cleanup] problems any sale is unlikely." The same letter proposed new financial terms on which HCC would exercise its option to purchase Neubauer's shares.

In June 1996, Goldfarb met a second time with representatives of BA Partners. At this meeting BA Partners told Goldfarb it "felt confident [it] could get 85 to 95 million" for HCC and that "under all the right circumstances and everything lining up" HCC could bring between $108 million and $127 million. Neubauer testified defendants never told him about BA Partners' estimate of the value of HCC.

The same day BA Partners advised Goldfarb HCC should sell for between $85 million and $127 million, Steven Goldfarb faxed a letter to Neubauer's counsel stating his understanding Neubauer was willing to sell his 40 percent share for $13.5 million ($15 million discounted for present value) and his understanding of the means by which the purchase price would be paid. The letter made no mention of the estimated value of HCC obtained from BA Partners.

Later that same month, Goldfarb discussed the sale of HCC with another investment banker, Furman Selz. Prior to the meeting, Goldfarb furnished Furman Selz with financial projections depicting the profitability of HCC for

fiscal years 1997 and 1998. He admits he did not share these financial projections with Neubauer.

Goldfarb met with a representative of Furman Selz on July 2, 1996. The Furman Selz representative advised Goldfarb the value of HCC was between $120 million and $160 million before taking into account its debts and other obligations. Neubauer asserts defendants never told him about this meeting or Furman Selz's opinion of HCC's value.

On July 3, 1996, the day after Goldfarb's meeting with Furman Selz, Neubauer executed a further amendment to the option agreement consenting to accept $13.5 million for his shares in HCC. The purchase price included a "tail" which provided that if, prior to November 1, 1997, HCC sold 40 percent or more of its shares for more than $15 million, Neubauer would receive $107,000 times the number of whole months or parts thereof between the closing of such transaction and October 31, 1997.

Three months after Neubauer sold his shares to HCC for $13.5 million, Windward Capital Partners purchased 65 percent of HCC for cash payments of $98.5 million plus interest.

Because this purchase exceeded 40 percent of the HCC shares for more than $15 million Neubauer received an additional payment of approximately $1 million under the "tail" agreement. Thus, Neubauer received approximately $14.5 million for his 206,600 shares in HCC or approximately $70 per share. In contrast, the Goldfarbs and Bateman received $71.8 million for their 207,000 shares in HCC or approximately $347 per share.

B. *Triable Issues of Fact Exist as to the Tort Causes of Action.*

1. *Directors' and Majority Shareholders' Duties of Disclosure under Delaware Law.*

In the leading case of *Lynch v. Vickers Energy Corp.*[31] the Delaware Supreme Court held directors and majority shareholders owe a fiduciary duty to minority shareholders which requires " 'complete candor' in disclosing fully 'all of the facts and circumstances surrounding' . . ." a transaction involving the minority.[32] "In evaluating whether defendants satisfied their

---

[31]*Lynch v. Vickers Energy Corp.* (Del. 1977) 383 A.2d 278.
[32]*Lynch v. Vickers Energy Corp.*, *supra*, 383 A.2d at page 279, citations omitted.

fiduciary duty of candor, the question is one of materiality."[33] Information which is material is "information such as a reasonable shareholder would consider important in deciding whether to sell or retain stock."[34] Thus a director or majority shareholder breaches the duty of candor owed to the minority by disseminating false information[35] or making misleading omissions.[36] Liability may be based on the failure to disclose income and cash flow projections[37] and appraisals of share value.[38]

### 2. *Issues of Fact Relating to the Goldfarbs' Disclosure Duties.*

■ Neubauer contends the Goldfarbs breached their fiduciary duties of disclosure and made misrepresentations of material facts by (1) failing to disclose HCC's projected profits for 1995-1996; (2) falsely stating Schott offered $25 million for 100 percent of the HCC shares when they knew the offer was for 50 percent; (3) failing to disclose the bonuses they awarded to themselves and Bateman; (4) falsely stating "no one will purchase the company at the price we had hoped" when they knew there were numerous companies interested in purchasing HCC for more than had been offered by Bain; (5) failing to disclose the value placed on the company by BA Partners; (6) failing to disclose HCC's projected profits for 1997-1998; (7) failing to disclose the value placed on the company by Furman Selz.

Under Delaware law, discussed above, a trier of fact could find the Goldfarbs breached their fiduciary duties of disclosure and made misrepresentations of fact.

### C. *The Triable Issues of Fact Are Material.*

The Goldfarbs argue even if Neubauer has raised triable issues of fact he has not raised triable issues of *material* fact as required to defeat a motion for summary adjudication.[39] They contend the alleged breaches of duty described above are not material for the following reasons.

The only tortious acts alleged to have occurred before Neubauer entered into the agreement to sell his shares in October 1995 were the representation concerning the Schott offer and the failure to inform Neubauer of the profit projections for 1995-1996.

---

[33]*Bershad v. Curtiss-Wright Corp.* (Del. 1987) 535 A.2d 840, 846.
[34]*Lynch v. Vickers Energy Corp., supra*, 383 A.2d at page 281.
[35]*Malone v. Brincat* (Del. 1998) 722 A.2d 5, 9.
[36]*Bershad v. Curtiss-Wright Corp., supra*, 535 A.2d at page 846.
[37]*Weinberger v. Rio Grande Industries, Inc.* (Del. Ch. 1986) 519 A.2d 116, 126-129.
[38]*In re Anderson, Clayton Shareholders Lit.* (Del. Ch. 1986) 519 A.2d 680, 692-693.
[39] Code of Civil Procedure section 437c, subdivision (p)(2).

A misrepresentation the Schott offer of $25 million was for the whole company instead of just half the company was not material, the Goldfarbs assert, because Neubauer knew at the time he entered into the agreement Bain had subsequently offered $74 million for the company and this is the offer he relied upon in agreeing to accept $18 million for his shares. Neubauer cannot complain he was not informed of Schotts' lower offer, assuming it evidenced a $50 million value for HCC, when he was informed of Bain's higher $74 million offer.

Under Delaware law, however, the Goldfarbs had a duty to inform Neubauer "of *all* germane facts," which the Delaware Supreme Court defined in the *Lynch* case as information "a reasonable shareholder would consider important in deciding whether to sell or retain stock."[40] The court subsequently expanded on this definition holding directors and majority shareholders must disclose all facts which would have been viewed by a reasonable investor as "having significantly altered the 'total mix' of information made available."[41] Whether a reasonable shareholder would consider a particular piece of information "important" or "significantly altering the total mix" of information made available is generally a question for the trier of fact.[42]

We cannot say as a matter of law a reasonable shareholder would *not* consider Schott's offer of $25 million for 50 percent of HCC important or significant to the "total mix" of information including the 1995-1996 profit estimate had it been disclosed. It does not necessarily follow the whole of the company was worth only twice as much as half the company. Purchasing an entire company gives the new owner total decisionmaking control over the company's assets, policies and future sale and eliminates the need to answer to oftentimes obstreperous and uncooperative minority shareholders.[43] Furthermore, even assuming Schott's offer was the equivalent of $50 million for the whole company, an offer of $74 million for the whole company a few months later might indicate to a reasonable investor there was an escalating market for the company and that even higher offers might materialize in the near future.

The Goldfarbs argue they had no duty to provide the 1995-1996 profit projections to Neubauer because as a matter of law such projections are mere

---

[40]*Lynch v. Vickers Energy Corp., supra*, 383 A.2d at page 281, italics in original.
[41]*Rosenblatt v. Getty Oil Co.* (Del. 1985) 493 A.2d 929, 944.
[42]*Cede & Co. v. Technicolor, Inc.* (Del. 1994) 636 A.2d 956, 956.
[43]See *Oppression of Minority Shareholders, supra*, 35 Clev. St. L.Rev. at page 122.

speculative predictions, not actionable facts.[44] This may be the rule in California but it is not the rule in Delaware. In Delaware, the failure to disclose profit projections may be a breach of the fiduciary duty of candor depending on the reliability of those projections which, under Delaware law, is a question of fact.[45]

We turn now to the Goldfarbs' alleged tortious representations and omissions which occurred after Neubauer entered into the buy-sell agreement in October 1995.[46] The Goldfarbs do not contend these representations and omissions were immaterial in the sense no reasonable shareholder would consider the information important in the decision whether to sell or retain his stock. Rather, the Goldfarbs argue these alleged acts and omissions are simply irrelevant because they occurred *after* Neubauer entered into the agreement to sell his shares and therefore they could not possibly have affected his decision. On the surface, this argument has some appeal. On closer inspection we find it flawed. While the post-October 1995 acts and omissions did not affect Neubauer's decision to sell his shares they may have affected subsequent negotiations between the parties over the price HCC would pay for those shares.

There is authority under Delaware law for the proposition the duty of "complete candor" includes a duty to disclose to a minority shareholder information affecting the value of the minority shares after the minority shareholder has agreed to sell the shares but before the sale takes place.

In *Kahn v. Household Acquisition Corp.*[47] minority shareholders of Wien Air Alaska, Inc., sued the corporation which acquired Wien, contending defendant breached its fiduciary duty to the minority through nondisclosure of essential financial data. In its November 1980 proxy statement, defendant stated "it is currently anticipated that [Wien's] actual net income for 1980 will be materially less than the amount projected, unless Wien's subsidy or mail rate from the U.S. Government, both of which are presently under review by the CAB [Civil Aeronautics Board], is increased during 1980 substantially over the amounts proposed by the CAB."[48] In December 1980 Wien and the CAB staff reached an agreement setting the subsidy rate at $6.2 million, an increase of $1.3 million over the proposal by the CAB referred to in the proxy statement. Defendant did not supplement its proxy

[44]*Zeh v. Alameda Community Hotel Corp.* (1932) 122 Cal.App. 366, 368 [10 P.2d 190].
[45]*Weinberger v. Rio Grande Industries, Inc., supra,* 519 A.2d at pages 126-127.
[46]See pages 60-62, *ante.*
[47]*Kahn v. Household Acquisition Corp.* (Del. 1991) 591 A.2d 166.
[48]*Kahn v. Household Acquisition Corp., supra,* 591 A.2d at page 170.

statement to reflect the December 1980 agreement.[49] The minority claimed defendant's failure to provide this updated information was a breach of its fiduciary duty because the information significantly affected the total mix of financial information which a reasonable shareholder could be expected to consider in order to judge the adequacy of the merger price offered by defendant. The trial court deemed the failure to disclose the December 1980 agreement immaterial and concluded its disclosure would not have significantly altered the total mix of information available to the shareholders.[50]

Noting the duty of disclosure is a mixed one of law and fact, the Delaware Supreme Court ruled in favor of the shareholders on the law but upheld the trial court's factual determination the information, had it been disclosed, would not have altered the way a reasonable shareholder looked at the merger offer. On the legal issue the court stated: "[T]he duty of complete disclosure should apply with equal force to supplemental as well as original proxy materials[.] . . . If subsequent events impart a new and significant slant on information already discussed, their disclosure is mandated."[51] The court qualified this holding by noting "subsequent events may have significance, and thus require disclosure, only as they relate to information originally disclosed."[52]

Arguably, in the present case triable issues of fact exist as to whether the alleged misrepresentations and omissions which occurred between the time Neubauer initially agreed to sell his shares and the consummation of the sale approximately a year later were "significantly related" to the information originally disclosed and would have been important in the "total mix" of information a reasonable shareholder would consider in deciding the price at which he would sell his shares. Both the information originally disclosed and the information subsequently misrepresented or omitted related to the valuation of Neubauer's HCC shares. On the other hand, it is possible to read the *Kahn* decision more narrowly to require a direct relationship between the information originally disclosed and the information subsequently misrepresented or omitted. In *Kahn*, the defendant's proxy statement disclosed negotiations were underway with the CAB on a subsidy for Wien. The defendant's alleged breach of duty was in failing to disclose the favorable result of those negotiations. In the present case the Goldfarbs disclosed to Neubauer negotiations were underway with Bain for the purchase of HCC and disclosed to Neubauer the unsatisfactory results of those negotiations. Thus, the Goldfarbs could argue they met their duty of candor under *Kahn*.

[49]*Kahn v. Household Acquisition Corp., supra,* 591 A.2d at page 170.
[50]*Kahn v. Household Acquisition Corp., supra,* 591 A.2d at page 171.
[51]*Kahn v. Household Acquisition Corp., supra,* 591 A.2d at page 171.
[52]*Kahn v. Household Acquisition Corp., supra,* 591 A.2d at page 171.

We need not resolve the question of how closely related the subsequent information must be to the original information to mandate disclosure of the subsequent information.[53] An independent and sufficient ground for reversing the Goldfarbs' summary adjudication exists.

In our view the alleged misrepresentations and omissions which occurred between October 1995, when Neubauer initially agreed to sell his shares for $18 million, and July 1996, when Neubauer agreed to sell his shares for $13.5 million, are material because each renegotiation of the sale price during that period triggered a new duty of complete candor on the Goldfarbs' part. The reasons for imposing a duty of "complete candor," after all, are to assure the minority shareholder possesses all information a reasonable shareholder would consider important in making a decision with respect to his stock and to prevent insiders from using special knowledge they may have to their own advantage and to the detriment of the minority.[54] Each renegotiation of the sale price required a decision on Neubauer's part. Therefore, at each renegotiation Neubauer was entitled to all information a reasonable shareholder would consider important in determining the selling price for his stock. Failing to provide such information at each renegotiation would constitute a breach of fiduciary duty under Delaware law.

Based on the above analysis, we find triable facts exist as to whether the Goldfarbs breached their fiduciary duty and made fraudulent or negligent misrepresentations of fact.

## CONCLUSION

To summarize our holdings: The judgment in favor of the Goldfarbs on the first through fourth causes of action is appealable. The order denying Neubauer leave to plead an additional cause of action against Andrew Goldfarb cannot be challenged on appeal in light of the settlement between Neubauer and Goldfarb. The trial court erred in granting summary adjudication in favor of the Goldfarbs on the first through fourth causes of action because Neubauer's purported waiver and release do not effectively shield the Goldfarbs from liability and there are triable issues of material fact as to whether the Goldfarbs made material false or misleading statements or failed to disclose material facts bearing on the value of Neubauer's stock.

---

[53]We have found no Delaware decision discussing how close a relationship is necessary to mandate disclosure under *Kahn.*

[54]*Lynch v. Vickers Energy Corp., supra,* 383 A.2d at page 281.

## Disposition

The judgment in favor of Andrew and Steven Goldfarb on the first through fourth causes of action is reversed. In all other respects the judgment is affirmed. Appellant is awarded his costs on appeal.

Perluss, P. J., and Woods, J., concurred.